No. 24-10241

# In the United States Court of Appeals for the Eleventh Circuit

ANNIE LOIS GRANT et al.,
*Plaintiffs-Appellants*,

v.

SECRETARY OF STATE OF GEORGIA,
*Defendant-Appellee*.

On Appeal from the United States District Court
for the Northern District of Georgia
No. 1:22-cv-00122—Steve C. Jones, Judge

## BRIEF FOR APPELLANTS

Joyce Gist Lewis
Adam M. Sparks
KREVOLIN & HORST, LLP
One Atlantic Center
1201 W. Peachtree St. NW,
Suite 3250
Atlanta, GA 30309
Telephone: (404) 888-9700

Abha Khanna
Makeba Rutahindurwa
ELIAS LAW GROUP LLP
1700 Seventh Ave,
Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0177

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Plaintiffs-Appellants certify that Annie Lois Grant, Quentin T. Howell, Elroy Tolbert, Triana Arnold James, Eunice Sykes, Elbert Solomon, Dexter Wimbish, Garrett Reynolds, Jacqueline Faye Arbuthnot, Jacquelyn Bush, and Mary Nell Conner are individuals and that no publicly held corporation or company has an interest in the outcome of this case.

Plaintiffs-Appellants further certify that the following have an interest in the outcome of this case:

1.  Arbuthnot, Jacqueline Faye, *Plaintiff*

2.  Bokat-Lindell, Noah B., *Counsel for Intervenor*

3.  Boyle Jr., Donald P., *Counsel for Defendant*

4.  Brown, Theron, *Former Plaintiff*

5.  Bush, Jacquelyn, *Plaintiff*

6.  Carr, Christopher, *Counsel for Defendant*

7.  Conner, Mary Nell, *Plaintiff*

8.  Duffey Jr., Hon. William S., *Former Defendant*

9.  Georgia Department of Law, *Counsel for Defendant*

10. Elias Law Group LLP, *Counsel for Plaintiffs*

11.    Flynn, Erin H., *Counsel for Intervenor*

12.    Ford, Christina A., *Counsel for Plaintiffs*

13.    Freeman, Daniel J., *Counsel for Intervenor*

14.    Ghazal, Sara Tindall, *Former Defendant*

15.    Grant, Annie Lois, *Plaintiff*

16.    Hamilton, Kevin J., *Former Counsel for Plaintiffs*

17.    Hawley, Jonathan P., *Former Counsel for Plaintiffs*

18.    Howell, Quentin T., *Plaintiff*

19.    Ivey, Marvis McDaniel, *Amicus Curiae*

20.    Jacoutot, Bryan F., *Counsel for Defendant*

21.    James, Triana Arnold, *Plaintiff*

22.    Johnston, Janice W., *Former Defendant*

23.    Jones, Michael B., *Former Counsel for Plaintiffs*

24.    Jones, Hon. Steve C., *U.S. District Judge*

25.    Khanna, Abha, *Counsel for Plaintiffs*

26.    Krevolin & Horst, LLC, *Counsel for Plaintiffs*

27.    LaRoss, Diane, *Counsel for Defendant*

28.    Le, Anh, *Former Defendant*

29.    Lewis, Joyce Gist, *Counsel for Plaintiffs*

30.    Lindsey, Edward, *Former Defendant*

31.    Mashburn, Matthew, *Former Defendant*

32.    McGowan, Charlene, *Former Counsel for Defendant*

33.    Osher, Daniel C., *Former Counsel for Plaintiffs*

34.    Paradise, Loree Anne, *Former Counsel for Defendant*

35.    Perkins Coie LLP, *Former Counsel for Plaintiffs*

36.    Petrany, Stephen J., *Counsel for Defendant*

37.    Raffensperger, Brad, *Defendant*

38.    Reynolds, Garrett, *Plaintiff*

39.    Rutahindurwa, Makeba, *Counsel for Plaintiffs*

40.    Solomon, Elbert, *Plaintiff*

41.    Sparks, Adam M., *Counsel for Plaintiffs*

42.    Stewart, Michael Elliot, *Counsel for Intervenor*

43.    Strickland, Frank B., *Counsel for Defendant*

44.    Sykes, Eunice, *Plaintiff*

45.    Taylor English Duma LLP, *Counsel for Defendant*

46.    Tolbert, Elroy, *Plaintiff*

47.    Tyson, Bryan P., *Counsel for Defendant*

48.    United States of America, *Intervenor*

49.    Vaughn, Elizabeth Marie Wilson, *Former Counsel for Defendant*

50.    Webb, Bryan K., *Counsel for Defendant*

51.    Weigel, Daniel H., *Counsel for Defendant*

52.    White, Graham W., *Former Counsel for Plaintiffs*

53.    Willard, Russell D., *Counsel for Defendant*

54.    Wimbish, Dexter, *Plaintiff*

## STATEMENT REGARDING ORAL ARGUMENT

Because this case raises significant questions about state legislatures' ability to undermine federal voting rights guarantees through the creation of remedial districting maps, Appellants respectfully request oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ..............................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF CONTENTS ...................................................................... ii

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ........................................................... v

STATEMENT OF THE ISSUES ............................................................. 1

INTRODUCTION ............................................................................. 1

STATEMENT OF THE CASE ............................................................... 2

STANDARD OF REVIEW .................................................................. 5

SUMMARY OF THE ARGUMENT ....................................................... 7

ARGUMENT................................................................................... 8

    I.  The district court erred in authorizing state legislative plans that
provide only partial remedies to Georgia's Section 2 violations.................. 8

    II. The 2023 plans defy the district court's ruling by eliminating Black
electoral opportunities elsewhere in Georgia...............................................13

CONCLUSION ...............................................................................16

CERTIFICATE OF COMPLIANCE....................................................17

CERTIFICATE OF SERVICE...........................................................18

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Milligan,*
    599 U.S. 1 (2023)................................................................3

*Alley v. U.S. Dep't of Health & Hum. Servs.,*
    590 F.3d 1195 (11th Cir. 2009).............................................6

**Bartlett v. Strickland,*
    556 U.S. 1 (2009).....................................................14, 15

*Cooper v. Harris,*
    581 U.S. 285 (2017)............................................................14

*Dillard v. Crenshaw County,*
    831 F.2d 246 (11th Cir. 1987)...............................................7

*Harper v. City of Chi. Heights,*
    223 F.3d 593 (7th Cir. 2000)................................................6

**League of United Latin Am. Citizens v. Perry,*
    548 U.S. 399 (2006)..............................................7, 10, 11, 13

*McGhee v. Granville County,*
    860 F.2d 110 (4th Cir. 1988)...............................................12

*North Carolina v. Covington,*
    581 U.S. 486 (2017)........................................................6, 11

**Shaw v. Hunt,*
    517 U.S. 899 (1996)..............................................8, 10, 11, 12, 13

*Thornburg v. Gingles,*
    478 U.S. 30 (1986)..........................................................2, 3, 10

*United States v. Brown,*
    561 F.3d 420 (5th Cir. 2009).................................................6

**United States v. Dall. Cnty. Comm'n,*
    850 F.2d 1433 (11th Cir. 1988)..........................................6, 7, 9

*White v. Alabama,*
  74 F.3d 1058 (11th Cir. 1996)..............................................................7

*Whitest v. Crisp Cnty. Sch. Dist.,*
  No. 22-11826, 2023 WL 8627498 (11th Cir. Dec. 13, 2023) .........................5, 6

*Williams v. City of Dothan,*
  818 F.2d 755 (11th Cir.), *opinion modified on denial of reh'g,*
  828 F.2d 13 (11th Cir. 1987)..............................................................13

*Wright v. Sumter Cnty. Bd. of Elections & Registration,*
  979 F.3d 1282 (11th Cir. 2020)...........................................................6

**Statutes**

28 U.S.C. § 1291.................................................................................v

28 U.S.C. § 1331.................................................................................v

28 U.S.C. § 1343.................................................................................v

28 U.S.C. § 1357.................................................................................v

42 U.S.C. § 1983.................................................................................v

42 U.S.C. § 1988.................................................................................v

# JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action pursuant to 42 U.S.C. §§ 1983 and 1988 and 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1357. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because Plaintiffs-Appellants are appealing from the final order of the district court in this matter that disposed of all parties' claims. This appeal is timely because the district court entered its final order on December 28, 2023, *see* Doc. 333, and Plaintiffs-Appellants filed their notice of appeal on January 22, 2024, *see* Doc. 335.

## STATEMENT OF THE ISSUES

1.     Whether the district court erred by holding that the General Assembly completely remedied the prior dilution of Black voting strength by creating new majority-Black districts outside the area where Plaintiffs proved their Section 2 claims at the expense of Black voters within the vote dilution area who were entitled to relief.

2.     Whether the district court erred by allowing the General Assembly to remedy the Section 2 violations by eliminating minority opportunity districts elsewhere in the plans, in direct contravention of the court's previous liability order and injunction.

## INTRODUCTION

The district court fundamentally erred in authorizing "remedial" state legislative plans that failed to provide a Section 2 remedy to thousands of Black voters who suffered—and continue to suffer—a vote dilution injury and that dismantled existing districts in which Black voters once had—but no longer have—the opportunity to elect their preferred candidates. Under Georgia's 2023 plans, the pursuit for "equal opportunity" for Black voters pursuant to Section 2 is a zero-sum game. And in approving those plans, the district court allowed the General Assembly to turn the "opportunity" it was afforded to adopt plans to "remedy the Section 2 violations" "consistent with[] [the court's] Order," Doc. 294 at 510, into an

opportunity to penalize minority voters for the Section 2 victory Plaintiffs secured, in violation of the district court's instructions and the very purpose of the Voting Rights Act. This Court must vacate the district court's opinion and remand with instructions for the district court to adopt new maps for the Georgia state legislature that completely and fully remedy the Section 2 violations.

## STATEMENT OF THE CASE

On December 30, 2021, Georgia enacted new state senate (SB 1 EX) and state house (HB 1 EX) maps into law. Doc. 91 at 14. Shortly thereafter, Plaintiffs—Black Georgia voters—filed suit and moved for a preliminary injunction, challenging each of the new plans as violations of Section 2 of the Voting Rights Act. *See generally* Doc. 1. The district court subsequently held a six-day preliminary injunction hearing. Doc. 294 at 16, 514–16.

On February 28, 2022, the district court found that Plaintiffs satisfied their burden under the well-established *Gingles* standard for adjudicating Section 2 vote dilution claims. Doc. 91 at 220. But the court denied relief after weighing the equities, concluding that, as of the date of its order, "there [wa]s insufficient time to effectuate remedial relief for purposes of the 2022 election cycle." *Id.* at 236–37; *id.* at 21–27 (citing *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring)).

2

Following discovery, the parties filed cross-motions for summary judgment. While those motions were pending, the Supreme Court issued its decision in *Allen v. Milligan*, 599 U.S. 1 (2023), reaffirming that plaintiffs alleging Section 2 vote dilution claims may prove a violation according to the test first articulated in *Thornburg v. Gingles*, 478 U.S. 30 (1986). Doc. 294 at 18–19. Applying the appropriate standard reaffirmed in *Milligan*, the district court found material issues of fact to be in dispute and denied the parties' motions. *Id.* at 19.

On October 26, 2023, following a two-week trial, the district court issued its final order, granting judgment for Plaintiffs. Doc. 294 at 506–08. The court permanently enjoined the Secretary from administering elections under the enacted plans, *id.* at 514, and it invited the General Assembly to craft remedial state legislative plans that included two additional majority-Black senate districts in the Atlanta metropolitan area and five additional majority-Black state house districts in the Atlanta metropolitan area and Georgia's Black Belt. *Id.* at 509. The court further instructed that the "State cannot remedy the Section 2 violations described herein by eliminating minority opportunity districts elsewhere in the plans." *Id.* at 509–10. The court "retain[ed] jurisdiction to determine whether the remedial plans adopted by the General Assembly remedy the Section 2 violations by incorporating additional legislative districts in which Black voters have a demonstrable opportunity to elect their candidates of choice." *Id.* at 510.

3

On December 8, 2023, Georgia enacted remedial state senate (SB 1EX) and state house (HB 1EX) plans. Doc. 333 at 2–3. SB 1EX included two new majority-Black senate districts in the Atlanta metropolitan area (new SD 17 and SD 28), and HB 1EX included five new majority-Black house districts: one in the western Atlanta metropolitan area (new HD 64), two in the southern Atlanta metropolitan area (new HD 74 and HD 117), and two anchored near Macon-Bibb County (new HD 145 and HD 149). *See* Doc. 317-1 ¶¶ 11, 31 (Esselstyn Remedial Report). Several of these new majority-Black districts, however, drew a significant portion of their Black voters from *outside* the vote dilution areas identified by this Court. In particular, 43.18% of the Black voting-age population (BVAP) of SD 28 and 22.57% of the BVAP of HD 145 was drawn from outside the vote dilution area, while a supermajority of the BVAP in HD 64 (67.45%) and HD 117 (65.86%) came from districts outside the areas found to be in violation of Section 2. *Id.* ¶¶ 13, 34, 36–37. Many of these Black voters *already resided* in districts in which they could elect their candidates of choice. *See* Doc. *id.* at 66, 373–74 & figs. 3, 8, 10.

The State's new state legislative plans not only bypassed broad swaths of Black voters proven to suffer a vote dilution injury, they simultaneously eliminated five pre-existing crossover districts in which Black candidates already had the opportunity to elect their preferred candidates, notwithstanding the instructions of the district court, *see* Doc. 294 at 509–10. These include Senate Districts 6 and 42

and House Districts 40, 81, and 82. *See* Doc. 317-2 ¶¶ 17–18 & fig.5 (Palmer Remedial Report).

On December 12, 2023, Plaintiffs objected to the new state legislative plans based on their failure to completely remedy the Section 2 violations identified by the district court in violation of the district court's October 26, 2023 Order. Doc. 317. Plaintiffs asked the Court to enjoin the Secretary from carrying out elections using the new maps and to adopt lawful maps for use in Georgia's 2024 elections. *Id.* at 18–19.

On December 28, 2023, the district court overruled Plaintiffs' objections to the 2023 plans. Doc. 333 at 2–3. The district court concluded that it lacked authority to require the General Assembly to concentrate remedial districts in the areas of the state where Plaintiffs proved Section 2 violations. *Id*. at 7–13. It also ruled that its October 26, 2023 Order could not have required the preservation of crossover districts, even where they afforded Black voters an opportunity to elect their preferred candidates, because "the very definition of a crossover district removes it from Section 2 protection." *Id*. at 13–14.

Plaintiffs timely appealed.

## STANDARD OF REVIEW

This Court reviews a district court order approving a legislative remedy to a Section 2 violation for abuse of discretion. *Whitest v. Crisp Cnty. Sch. Dist.*, No. 22-

11826, 2023 WL 8627498, at *2 (11th Cir. Dec. 13, 2023). The Court also reviews "a district court's interpretation of its own order[]" for abuse of discretion. *Alley v. U.S. Dep't of Health & Hum. Servs.*, 590 F.3d 1195, 1202 (11th Cir. 2009). Under the familiar abuse-of-discretion standard, the Court "review[s] the district court's factual findings regarding a Section 2 violation for clear error and its legal conclusions *de novo*." *Harper v. City of Chi. Heights*, 223 F.3d 593, 599–600 (7th Cir. 2000). The deferential nature of the abuse of discretion standard thus "does nothing to inhibit" the Court's "power to correct errors of law." *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1301 (11th Cir. 2020) (quoting *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1227 (11th Cir. 2000)).

"Relief in redistricting cases is fashioned in the light of well-known principles of equity. A district court therefore must undertake an equitable weighing process to select a fitting remedy for the legal violations it has identified, taking account of what is necessary, what is fair, and what is workable." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (cleaned up). The district court's discretion to approve an appropriate remedy to a Section 2 violation "is not without limit." *United States v. Brown*, 561 F.3d 420, 435 (5th Cir. 2009). Section 2 violations require relief that "completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice." *United States v. Dall. Cnty. Comm'n*, 850 F.2d 1433, 1442 (11th

Cir. 1988) (emphases omitted) (quoting S. Rep. No. 97-417, at 31 (1982)); *see also White v. Alabama*, 74 F.3d 1058, 1069 n.36 (11th Cir. 1996) (same). Thus, "[t]his Court cannot authorize an element of an election proposal that will not with certitude *completely* remedy the Section 2 violation." *Dillard v. Crenshaw County*, 831 F.2d 246, 252–53 (11th Cir. 1987).

## SUMMARY OF THE ARGUMENT

The court erred in "authoriz[ing]" at least two "element[s]" of the remedial maps "that will not with certitude *completely* remedy the Section 2 violation." *Dillard*, 831 F.2d at 252–53.

First, the new majority-Black districts in Georgia's 2023 state legislative maps only *partially* draw from the area found to be in violation of Section 2—and thus at best only *partially* remedy the vote dilution injury inflicted by the previous map. Because Section 2 forbids states from "trad[ing] off the rights of some members of a racial group against the rights of other members of that group," *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 437 (2006) ("*LULAC*"), it cannot sanction remedies that cut off from relief tens of thousands of Black Georgians who suffered—and continue to suffer—unlawful vote dilution.

Second, although the district court's October 26, 2023 order expressly prohibited Georgia from "remedy[ing] the Section 2 violations" identified in the

2021 plans "by eliminating minority opportunity districts elsewhere in the plans," Doc. 294 at 509–10, the 2023 state legislative plans do just that.

This Court should vacate the district court's decision approving the 2023 state legislative plans and remand for the district court to adopt lawful remedies to the Section 2 violations.

## ARGUMENT

## I.     The district court erred in authorizing state legislative plans that provide only partial remedies to Georgia's Section 2 violations.

By approving remedial majority-Black districts that are comprised in large part of voters outside the areas found to be in violation of Section 2, the district court failed to heed the Supreme Court's admonition that "[t]he vote dilution injuries suffered" by voters in one area "are not remedied by creating a safe majority-black district somewhere else in the state." *Shaw v. Hunt*, 517 U.S. 899, 917 (1996).

The district court's detailed ruling specified the precise locations where Plaintiffs proved Section 2 violations—and thus the precise locations where the General Assembly was required to provide Section 2 remedies. Specifically, the district court explicitly defined the area of Georgia where the Section 2 violations occurred in the 2021 plans: (1) "Enacted Senate Districts 10, 16, 17, 25, 28, 30, 34, 35, 43, and 44"; and (2) "Enacted House Districts 61, 64, 74, 78, 117, 133, 142, 143, 145, 147, and 149." Doc. 294 at 514. The new majority-Black districts in the 2023 plans, however, only partially draw from these specified areas, and in some cases

are primarily anchored wholly outside the vote dilution area. In particular, nearly a quarter of HD 145's BVAP, nearly half of SD 28's BVAP, and *more than half* of HDs 64 and 117's BVAP include Black Georgians who live *outside* of the vote dilution areas identified by the district court. Doc. 317-1 at ¶¶ 13, 34, 36–37. As a result, thousands upon thousands of eligible Black voters who suffered vote dilution under the 2021 state legislative maps continue to reside in districts in which they have no opportunity to elect their preferred candidates. *Id.* ¶¶ 14, 38 (185,186 Black voters in the vote dilution area not residing in a majority-Black district in SB 1EX and 57,630 Black voters in the vote dilution area not residing in a majority-Black district in HB 1EX). Thus, rather than "completely remed[ying] the prior dilution of minority voting strength," *Dall. Cnty. Comm'n*, 850 F.2d at 1438 (emphasis added), SB 3EX fails to fully remedy the "significant harm" suffered by those Black voters in Georgia "whose voting rights have been injured by the violation of the Section 2." Doc. 286 at 510.

In approving the 2023 state legislative plans, the district court abdicated its duty to ensure a complete remedy for minority vote dilution. Both the district court and the Secretary agreed that the State "cannot remedy vote dilution by creating a safe majority-Black district somewhere else in the State." Doc. 333 at 5, 8. For good reason: the Supreme Court has squarely considered and rejected the notion that the demonstration of a Section 2 violation somewhere in the state gives the General

Assembly license to "draw a majority-minority district anywhere, even if the district is in no way coincident with the compact *Gingles* district." *Shaw*, 517 U.S. at 916–17. But the district court failed to consider the significant ways in which several of the new majority-Black districts do not "coincide[] with the compact *Gingles* district[s]" on which the original Section 2 violation was based. Instead, the court was satisfied as long as *some* portion of the remedial districts shared "areas in common" with the areas in need of a remedy. Doc. 333 at 10.

The "remedial authority of a federal court" is not properly discharged where the court-mandated remedial districts only *somewhat* overlap with the court-determined areas of vote dilution that triggered the need for a remedy in the first place. *See Shaw*, 517 U.S. at 915, 918 (striking down map even though purported remedial district encompassed 20 percent of the vote dilution area and included "the heavy concentration of African Americans" in the "same urban component" of the area). Instead, federal courts are required to ensure that the remedy is, in fact, "remedial in nature, that is, it must be designed as nearly as possible to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Id*. at 915 (cleaned up). The Supreme Court reaffirmed this principle in *LULAC*, where it "rejected the premise that a State can always make up for the less-than-equal opportunity of some individuals by providing greater opportunity to others" through "an offsetting opportunity district" and emphasized

the "limits" of states' discretion in this regard. 548 U.S. at 429. Ultimately, the Court held, "the State's creation of an opportunity district for those without a § 2 right offers no excuse for its failure to provide an opportunity district for those with a § 2 right." *Id.* at 430.

Here, Plaintiffs established a Section 2 violation "for [] particular area[s]," *Shaw*, 517 U.S. at 917, which "flows from the fact that individuals in th[ese] area[s] 'have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *Id*. (quoting 42 U.S.C. § 1973(b)). But rather than designing the remedial districts to restore the Section 2 rights of voters in those areas, the General Assembly bypassed tens of thousands of those voters and chose instead to reach outside the vote dilution areas to provide a "remedy" to voters who had suffered no Section 2 injury at all, many of whom already had the opportunity to elect their preferred candidates, Doc. 317-1 66, 373–74, & figs. 3, 8, 10 . As a result, the Black voters carved out of the remedial districts are "still [] suffering precisely the same injury that they suffered before [the new majority-Black districts] w[ere] drawn." *Shaw*, 517 U.S. at 917.

The General Assembly's decision to bypass broad swaths of Black voters in the vote dilution areas was neither "necessary" nor "fair," *Covington*, 581 U.S. at 488. Plaintiffs demonstrated in multiple ways through their illustrative maps that the vote dilution areas were broad enough to afford the General Assembly significant

discretion in actually aligning the remedy to the right. *See, e.g.*, Doc. 317-1. Contrary to the district court's suggestion, these illustrative maps were not mere "beauty contest" contenders, Doc. 333 at 13 (quoting *Allen*, 599 U.S. at 21)—they were proof positive that complete relief for Georgia's Black voters who suffered vote dilution injuries under the previous maps was readily available. And while the district court accurately noted that "'the inevitably rough-hewn, approximate redistricting remedy' will result in *some* members of the minority group residing outside of the minority-controlled districts," *Id*. at 13 (emphasis added) (quoting *McGhee v. Granville County*, 860 F.2d 110, 119 (4th Cir. 1988)); *see also Shaw*, 517 at 917 n.9 (noting that not every Section 2 plaintiff "has the right to be placed in a majority-minority district once a violation of the statute is shown"), it was wrong to rely on that practical reality to allow the State to unjustifiably exclude tens of thousands of injured Black voters from any relief whatsoever. *See McGhee*, 860 F.2d at 118 ("A restructuring to the maximum extent permitted by the[] constraints [of size, compactness, and cohesion of Black population] is a 'complete' and legally adequate remedy for such a dilution violation."). The court in *McGhee* understood that the Section 2 "right and remedy are inextricably bound together, for to prove vote dilution by districting one must prove the specific way in which dilution may be remedied by redistricting." *Id*. at 120. Here the right and the remedy do not align.

Because the 2023 plans failed to completely remedy the 2021 plans' Section 2 violations, the district court was required to reject them. *See LULAC*, 548 U.S. at 402; *Shaw*, 517 U.S. at 917.

## II.    The 2023 plans defy the district court's ruling by eliminating Black electoral opportunities elsewhere in Georgia.

The General Assembly's elimination of five effective crossover districts across the state flatly violates the district court's order and injunction on the Section 2 violation. "It is beyond question that obedience to judicial orders is an important public policy. An injunction issued by a court acting within its jurisdiction must be obeyed until the injunction is vacated or withdrawn." *Williams v. City of Dothan*, 818 F.2d 755, 760 (11th Cir.) (quotation omitted), *opinion modified on denial of reh'g*, 828 F.2d 13 (11th Cir. 1987). Here, the district court's order stressed that any remedy must "provide[] Black voters with an additional opportunity district" without "eliminating minority opportunity districts elsewhere in the plans." Doc. 286 at 510–11. But the General Assembly's new state legislative plans do just that by dismantling several effective crossover districts across the state. Contrary to the letter and spirit of both the district court's order and the Voting Rights Act, the General Assembly chose to remedy the vote dilution identified by the district court by limiting Black voting strength statewide.

In defending SB 3EX, the Secretary read the word "opportunity" right out of the court's order, arguing that so long as the General Assembly did not eliminate any

pre-existing majority-Black districts, the court's order was satisfied. Doc. 326 at 54. And rather than enforce the plain meaning of its previous ruling, the district court concluded its hands were tied because "the very definition of a crossover district removes it from Section 2 protection." Doc. 333 at 14. But the fact that Section 2 does not *require* crossover districts, *see Bartlett v. Strickland*, 556 U.S. 1, 19 (2009) (plurality op.), does not mean Section 2 is not "*satisfied by* crossover districts," *Cooper v. Harris*, 581 U.S. 285, 305 (2017), or otherwise make crossover districts fair game for elimination in the course of a Section 2 remedy. After all, crossover districts are by definition districts in which a minority group, "if receiving help from some white [voters], could elect [its] candidates of [] choice." *Cooper*, 581 U.S. at 305; *see also Bartlett*, 556 U.S. at 13 ("[I]n a crossover district, the minority population, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate.").

Here there was no dispute that the five crossover districts eliminated by the General Assembly had previously performed for Black-preferred candidates. Doc. 317-2 ¶¶ 17–18 & fig.5. The General Assembly's decision to dismantle these districts thus resulted in the "eliminat[ion] [of] minority opportunity districts"—and specifically Black opportunity districts—"elsewhere in the plans." Doc. 294 at 509–10. This not only defies the plain meaning of the district court's injunction, it

undermines the very purpose of the Voting Rights Act, *see Bartlett*, 556 U.S. at 25 ("Crossover districts are, by definition, the result of white voters joining forces with minority voters to elect their preferred candidate. The Voting Rights Act was passed to foster this cooperation.").[1]

There is no credible argument that destroying these crossover districts was necessary to remedy the identified Section 2 violations. Plaintiffs' illustrative House plan, for instance, created a new majority-Black district in west-metro Atlanta, two new majority-Black districts in south-metro Atlanta, and two majority-Black districts in Macon-Bibb without making any changes to HDs 40, 81, or 82. *See* Def.'s Tr. Ex. 3 (Rebuttal Expert Report of John B. Morgan) at Ex. 15. By contrast, under the new House plan, none of these districts retain any of their population. Doc. 317-1 ¶ 46. And Plaintiffs' illustrative Senate plan made only minimal changes to Senate Districts 6 and 42. Morgan Rebuttal Rep. at Ex. 8. By contrast, under the new plan, Senate District 42 retains none of its previous population. Doc. 317-1 ¶ 21; Doc. 317-2 ¶ 14.

---

[1] The General Assembly's decision to dismantle performing crossover districts also raises serious constitutional concerns. *See Bartlett*, 556 U.S. at 24 ("[I]f there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments."). But the Court need not make a finding of an independent constitutional violation in order to determine that the 2023 state legislative pans are not lawful Section 2 remedies.

Ultimately, whether the districts eliminated were majority-Black districts or crossover districts, the effect on Black opportunity is the same. The General Assembly's decision to provide Black Georgians new electoral opportunities with one hand while snatching away existing electoral opportunities with the other violates the district court's clear instructions, abuses the opportunity the General Assembly was afforded to remedy the Section 2 violation in the first place, and undermines the fundamental principles the Voting Rights Act was designed to protect.

## CONCLUSION

For the foregoing reasons, the district court's remedial order should be vacated and the matter remanded for further proceedings.

Dated: May 3, 2024                    Respectfully submitted,

                                                     By *Abha Khanna*
Joyce Gist Lewis                            Abha Khanna
Georgia Bar No. 296261               Makeba Rutahindurwa
Adam M. Sparks                           ELIAS LAW GROUP LLP
Georgia Bar No. 341578               1700 Seventh Ave.,
KREVOLIN & HORST, LLC            Suite 2100
One Atlantic Center                       Seattle, WA 98101
1201 W. Peachtree St. NW,          (206) 656-0177
Suite 3250                                    AKhanna@elias.law
Atlanta, GA 30309                        MRutahindurwa@elias.law
(404) 888-9700
JLewis@khlawfirm.com
Sparks@khlawfirm.com

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Fed. R. App. P. 27(d)(2), as it contains 3911 words, excluding those parts exempted by 11th Cir. Local R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as the brief has been prepared in a proportionally spaced typeface using Microsoft Word Times New Roman 14-point font.

Dated: May 3, 2024

*Joyce Gist Lewis*
*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that, on May 3, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Dated: May 3, 2024

*Joyce Gist Lewis*
*Counsel for Plaintiffs-Appellants*