No. 24-10241

In the

# United States Court of Appeals
## for the Eleventh Circuit

---

Annie Lois Grant, et al.,

*Plaintiff-Appellants*,

v.

Secretary of State of Georgia,

*Defendant-Appellee*.

---

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 1:22-cv-00122 — Steve C. Jones, *Judge*

---

## BRIEF OF THE SECRETARY OF STATE OF GEORGIA

---

Bryan P. Tyson
Bryan F. Jacoutot
Diane F. LaRoss
  *Special Asst. Att'ys General*

Taylor English Duma LLP
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249
btyson@taylorenglish.com

Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
Paul R. Draper
  *Deputy Solicitor General*

Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for the Secretary of State of Georgia*

*Annie Lois Grant v. Sec'y of State of Ga.*, No. 24-10241

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

I hereby certify that the following persons and entities may have an interest in the outcome of this case:

Albert M. Pearson LLC, Counsel for Amicus;

Allensworth, Robert M., Attempted Amicus;

Alpha Phi Alpha Fraternity, Inc., *APA* Plaintiff;

Adegbile, Debo, Counsel for *APA* Plaintiffs;

Allen, De'Ericka, Counsel for *APA* Plaintiffs;

American Civil Liberties Union Foundation, Inc., Counsel for *APA* Plaintiffs;

American Civil Liberties Union Foundation of Georgia, Inc., Counsel for *APA* Plaintiffs;

Arbuthnot, Jacqueline Faye, *Grant* Plaintiff;

Bokat-Lindell, Noah B., Counsel for Intervenor U.S. Department of Justice;

Boone, Robert, Counsel for *APA* Plaintiffs;

Bowles, Jasmine, Amicus;

Boyle, Jr., Donald P., Counsel for Defendant;

Brown, Phil, *APA* Plaintiff;

Brown, Theron, *Grant* Plaintiff;

Bush, Jacquelyn, *Grant* Plaintiff;

*Annie Lois Grant v. Sec'y of State of Ga.*, No. 24-10241

Calvo-Friedman, Jennessa, Former Counsel for *APA* Plaintiffs;

Carr, Christopher M., Counsel for Defendant;

Cheung, Ming, Counsel for *APA* Plaintiffs;

Common Cause, Amicus;

Conner, Mary Nell, *Grant* Plaintiff;

Crowell & Moring LLP, Counsel for Amicus;

Data, Sonika, Counsel for *APA* Plaintiffs;

DiGiuseppe, Marisa A., Counsel for *APA* Plaintiffs;

Douglas, Maura, Counsel for *APA* Plaintiffs;

Draper, Paul, Assistant Solicitor General, Counsel for Defendant;

Georgia Department of Law, Counsel for Defendant;

Davis, Alexander S., Counsel for Amicus;

Dechert LLP, Counsel for Amicus;

DiGiuseppe, Marisa A., Counsel for *APA* Plaintiffs;

Dixit, Anuj, Counsel for *APA* Plaintiffs;

Douglas, Maura, Counsel for *APA* Plaintiffs;

Duffey, Jr., William S., Former Defendant in *Grant* and *Pendergrass*;

Election Law Clinic at Harvard Law School, Amicus;

Elias Law Group LLP, Counsel for *Grant* and *Pendergrass* Plaintiffs;

*Annie Lois Grant v. Sec'y of State of Ga.*, No. 24-10241

Fair Districts GA, Amicus;

Flynn, Erin H., Counsel for Intervenor;

Ford, Christina Ashley, Counsel for *Grant* and *Pendergrass* Plaintiffs;

Freeman, Daniel J., Counsel for Intervenor;

GALEO Latino Community Development Fund, Inc., Amicus;

Garabadu, Rahul, Former Counsel for *APA* Plaintiffs;

Geaghan-Breiner, Charlotte, Counsel for *APA* Plaintiffs;

Genberg, Jack, Counsel for Amicus;

Georgia Coalition for the People's Agenda, Amicus;

Georgia State Conference of the NAACP, Amicus;

Ghazal, Sara Tindall, Former Defendant in *Grant* and *Pendergrass*;

Glaze, Ojuan, *Pendergrass* Plaintiff;

Glenn, Katie Bailey, *APA* Plaintiff;

Grant, Annie Lois, *Grant* Plaintiff;

Graves, Cheryl, Amicus;

Greenbaum, Jon, Counsel for Amicus;

Greenwood, Ruth M., Counsel for Amicus;

Hamilton, Kevin J., Former Counsel for *Grant* and *Pendergrass* Plaintiffs;

Harrison, Keith, Counsel for Amicus;

*Annie Lois Grant v. Sec'y of State of Ga.*, No. 24-10241

Hawley, Jonathan Patrick, Counsel for *Grant* and *Pendergrass* Plaintiffs;

Heard, Bradley E., Counsel for Amicus;

Heaven, Astor H.L., Counsel for Amicus;

Hennington, Elliott, *Pendergrass* Plaintiff;

Hessel, Daniel J., Counsel for Amicus;

Houk, Julie M., Counsel for Amicus;

Howell, Quentin T., *Grant* Plaintiff;

Isaacson, Cory, Counsel for *APA* Plaintiffs;

Ivey, Marvis McDaniel, Amicus;

Jacoutot, Bryan F., Counsel for Defendant;

Jackson, Toni Michelle, Counsel for Amicus;

James, Triana Arnold, *Grant* and *Pendergrass* Plaintiff;

Jamieson, Nathan, Counsel for Amicus;

Johnston, Janice W., Former Defendant in *Grant* and *Pendergrass*;

Jones, Michael Brandon, Counsel for *Grant* and *Pendergrass* Plaintiffs;

Jones, Steve C., Judge, U.S. District Court, Northern District of Georgia;

Kastorf Law LLP, Counsel for Amicus;

Kastorf, Kurt, Counsel for Amicus;

*Annie Lois Grant v. Sec'y of State of Ga.*, No. 24-10241

Khanna, Abha, Counsel for *Grant* and *Pendergrass* Plaintiffs;

Kim, Eliot, Former Counsel for *APA* Plaintiffs;

Kim, Taeyoung, Counsel for *APA* Plaintiffs;

Krevolin & Horst LLC, Counsel for *Grant* and *Pendergrass* Plaintiffs;

Lakin, Sophia Lin, Counsel for *APA* Plaintiffs;

LaRoss, Diane F., Counsel for Defendant;

Lawyers' Committee for Civil Rights Under Law, Counsel for Amicus;

Le, Anh, Former Defendant in *Grant* and *Pendergrass*;

League of Women Voters of Georgia, Amicus;

Lee, Theresa J., Counsel for Amicus;

Lewis, Joyce Gist, Counsel for *Grant* and *Pendergrass* Plaintiffs;

Lindsey, Edward, Former Defendant in *Grant* and *Pendergrass*;

Love-Olivo, Cassandra Nicole, Counsel for Amicus;

Mashburn, Matthew, Former Defendant in *Grant* and *Pendergrass*;

May, Caitlyn Felt, Counsel for *APA* Plaintiffs;

McGowan, Charlene, Former Counsel for Defendant;

Miller, Alex W., Counsel for *APA* Plaintiffs;

Miller, Kelsey A., Counsel for *APA* Plaintiffs;

Mitchell, Cassandra, Counsel for *APA* Plaintiffs;

*Annie Lois Grant v. Sec'y of State of Ga.*, No. 24-10241

O'Donnell, Courtney, Counsel for Amicus;

Osher, Daniel C., Former Counsel for *Grant* and *Pendergrass* Plaintiffs;

Paradise, Loree Anne, Former Counsel for Defendant;

Pearson, III, Albert Matthews, Counsel for Amicus;

Pendergrass, Coakley, *Pendergrass* Plaintiff;

Perkins Coie LLP, Former Counsel for *Grant* and *Pendergrass* Plaintiffs;

Perkins, Brianne, Amicus;

Petrany, Stephen J., Solicitor General, Counsel for Defendant;

Raffensperger, Brad, Defendant in his official capacity as Secretary of State of Georgia;

Reynolds, Garrett, *Grant* Plaintiff;

Richards, Roberts, *Pendergrass* Plaintiff;

Rollins-Boyd, David, Counsel for Amicus;

Rosenberg, Ezra D., Counsel for Amicus;

Rueckert, Jens, *Pendergrass* Plaintiff;

Ruiz Toro, Juan M., Counsel for *APA* Plaintiffs;

Rutahindurwa, Makeba, Counsel for *Grant* and *Pendergrass* Plaintiffs;

Savitsky, Ari J., Counsel for *APA* Plaintiffs;

Shaw, Abigail, Former Counsel for *APA* Plaintiffs;

*Annie Lois Grant v. Sec'y of State of Ga.*, No. 24-10241

Sivaram, Anuradha, Former Counsel for *APA* Plaintiffs;

Sixth District of the African Methodist Episcopal Church, *APA* Plaintiff;

Smith, Casey Katherine, Counsel for *APA* Plaintiffs;

Solomon, Elbert, *Grant* Plaintiff;

Southern Poverty Law Center, Counsel for Amicus;

Sparks, Adam M., Counsel for *Grant* and *Pendergrass* Plaintiffs;

Steiner, Neil, Counsel for Amicus;

Stewart, Janice, *APA* Plaintiff;

Stewart, Michael Elliot, Counsel for Intervenor;

Strickland, Frank B., Counsel for Defendant;

Sullivan, Rebecca N., Former Defendant in *Grant* and *Pendergrass*;

Sykes, Eunice, *Grant* Plaintiff;

Taylor English Duma LLP, Counsel for Defendant;

Thomas, Ursula, Amicus;

Tolbert, Elroy, *Grant* Plaintiff;

Tsai, Denise, Counsel for *APA* Plaintiffs;

Tyson, Bryan P., Counsel for Defendant;

United States Department of Justice, Intervenor;

Varghese, George P., Counsel for *APA* Plaintiffs;

*Annie Lois Grant v. Sec'y of State of Ga.*, No. 24-10241

Vaughan, Elizabeth Marie Wilson, Former Counsel for Defendant;

Webb, Bryan K., Counsel for Defendant;

Weigel, Daniel H., Counsel for Defendant;

Weitzman, Samuel, Former Counsel for *APA* Plaintiffs;

White, Graham, Former Counsel for *Grant* and *Pendergrass* Plaintiffs;

Willard, Russell D., Former Counsel for Defendant;

Williams, Ayana, Former Counsel for *APA* Plaintiffs;

Williams, H. Benjamin, Amicus;

Williams, Edward Henderson, Former Counsel for *APA* Plaintiffs;

Wilmer Cutler Pickering Hale and Dorr LLP, Counsel for *APA* Plaintiffs;

Wimbish, Dexter, *Grant* Plaintiff;

Woods, Eric T., *APA* Plaintiff;

Young, Sean Jengwei, Former Counsel for *APA* Plaintiffs;

Zabel, Joseph D., Former Counsel for *APA* Plaintiffs

Respectfully submitted this 2nd day of August, 2024.

/s/ Bryan P. Tyson
Bryan P. Tyson
Counsel for Appellee

## STATEMENT REGARDING ORAL ARGUMENT

The Secretary requests oral argument. Though the legal issues are not difficult, the record is extensive and oral argument could help the Court in resolving the appeals.

# TABLE OF CONTENTS

**Page**

Statement Regarding Oral Argument ............................................... i

Table of Authorities ........................................................ iv

Introduction ............................................................. 1

Statement of the Case .................................................... 4

      A. Factual background......................................... 5

          1. Georgia enacts new redistricting maps in the wake of the 2020 census. .................................................. 5

          2. Plaintiffs challenge Georgia's maps......................... 6

          3. The legislature adopts remedial maps. .................. 7

              a. State Senate remedial plan ............................ 8

              b. State House remedial plan ........................... 10

          4. The district court determines that the remedial maps "fully complied" with its order. .................... 14

      B. Standard of review. ....................................... 16

Summary of Argument .................................................. 17

Argument .............................................................. 20

      I. The remedial maps satisfy the district court's order. .... 20

          A. The district court was correct to approve the State's remedial maps, and it certainly did not abuse its discretion. ........................................... 21

          B. Plaintiffs' counterarguments hold no weight. ....... 30

# TABLE OF CONTENTS
## (continued)

**Page**

    1.  Nothing in § 2 limits the State to creating majority-black districts within the unlawful, prior district lines. ........................................ 31

    2.  Regardless, the district court did not order such relief. .................................................... 38

II.  The district court correctly ruled that the legislature was not required to maintain "crossover districts."............... 39

    A.  The district court did not require the State to preserve crossover districts.................................... 40

    B.  Crossover districts are not protected by Section 2.43

Conclusion........................................................................ 47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. S.C. State Conf. of the NAACP,*
  144 S. Ct. 1221 (2024) ...................................................... 1, 18, 22

*Allen v. Milligan,*
  599 U.S. 1 (2023) ........................................................ 21

*Alley v. United States HHS,*
  590 F.3d 1195 (11th Cir. 2009) ..................................... 17, 29, 42

*Bartlett v. Strickland,*
  556 U.S. 1 (2009) ............................................................*passim*

*Bethune-Hill v. Va. State Bd. of Elecs.,*
  580 U.S. 178 (2017) .................................................... 22

*Bone Shirt v. Hazeltine,*
  461 F.3d 1011 (8th Cir. 2006) ..................................... 17

*Bush v. Vera,*
  517 U.S. 952 (1996) ..................................................... 18, 22, 24

*Cave v. Singletary,*
  84 F.3d 1350 (11th Cir. 1996) ..................................... 17, 29, 42

*Clark v. Calhoun County,*
  88 F.3d 1393 (5th Cir. 1996) ..................................... 24

*Cooper v. Harris,*
  581 U.S. 285 (2017) ........................................................ 45, 46

*Godfrey v. BellSouth Telecoms.,*
  89 F.3d 755 (11th Cir. 1996) ..................................... 16

*Justice for All v. Faulkner*,
  410 F.3d 760 (5th Cir. 2005) ...................................................... 39

*Large v. Fremont County*,
  670 F.3d 1133 (10th Cir. 2012) ................................................. 16

*League of United Latin Am. Cit. v. Perry*,
  548 U.S. 399 (2006) ..................................................23, 31, 35, 36

*Luna v. County of Kern*,
  291 F. Supp. 3d 1088 (E.D. Cal. 2018)....................................... 32

*McGhee v. Granville County*,
  860 F.2d 110 (11th Cir. 1988) ............................................*passim*

*Miller v. Johnson*,
  515 U.S. 900 (1995) ...................................................... 17, 18, 22

*Nixon v. Kent County,*
  76 F.3d 1381 (6th Cir. 1996) .................................................... 46

*Petteway v. Galveston County*,
  No. 23-40582, slip op. (5th Cir. Aug. 1, 2024)............................ 47

*Rodriguez v. Bexar County*,
  385 F.3d 853 (5th Cir. 2004) .................................................... 17

*Rucho v. Common Cause*,
  588 U.S. 684 (2019) .......................................................... 22, 23

*Seastrunk v. Burns*,
  772 F.2d 143 (5th Cir. 1985) ............................................... 22, 23

*Shaw v. Hunt*,
  517 U.S. 899 (1996) ..........................................................*passim*

*Shaw v. Reno*,
  509 U.S. 630 (1993) ................................................................. 34

*Tallahassee Branch of NAACP v. Leon County*,
   827 F.2d 1436 (11th Cir. 1987) ........................................... 17, 23

*Thompson v. Kemp*,
   309 F. Supp. 3d 1360 (N.D. Ga. 2018) ..................................... 32

*Thornburg v. Gingles*,
   478 U.S. 30 (1986) ........................................................ 33

*U.S. v. Dallas County Comm'n*,
   850 F.2d 1433 (11th Cir. 1988) ................................................. 28

*U.S. v. Hays*,
   515 U.S. 737 (1995) ................................................... 31

*Voinovich v. Quilter*,
   507 U.S. 146 (1993) ......................................................... 23, 37

*Wise v. Lipscomb*,
   437 U.S. 535 (1978) ......................................................... 21, 38

**Statutes**

52 U.S.C. § 10301.................................................................*passim*

## INTRODUCTION

The Supreme Court recently cautioned that "we must be wary of plaintiffs who seek to transform federal courts into weapons of political warfare that will deliver victories that eluded them in the political arena." *Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221, 1236 (2024) (quotation omitted).  This is exactly what Plaintiff-Appellants seek in this appeal—to commandeer the Voting Rights Act to achieve their political goals through the courts.

This case arises out of Plaintiffs' challenge to Georgia's 2021 redistricting.  After the 2020 census, Georgia adjusted the electoral lines for its state and federal offices.  Plaintiffs challenged those maps on the basis that they supposedly diluted black voters' political opportunities, in violation of § 2 of the VRA. The district court agreed, holding that Georgia's maps needed additional majority-black districts.  The district court granted the State of Georgia time to produce remedial maps, provided they include two new majority-black state Senate districts in south metro Atlanta along with five new majority-black state House districts in south metro Atlanta and elsewhere.  Doc. 294 at 509–511.

Georgia did just that, producing maps with the additional majority-black districts in south metro Atlanta and other areas the district court had ordered.  Plaintiffs challenged those maps as well, but the district court—which, of course, had just a month earlier held that Georgia's original maps violated § 2—found that the remedial maps "fully complied with [its] order."  Doc. 333 at 16.

The district court's decision was plainly correct, as Plaintiffs cannot even assert that Georgia failed to draw the required additional majority-black districts.  Instead, Plaintiffs complain that Georgia did not draw the districts in the ways *they* would have preferred—which, not coincidentally, would have been beneficial to Democrats, as opposed to Republicans.  Plaintiffs argue, for instance, that the remedial districts were supposed to be drawn entirely within the lines of the former districts where the district court found vote dilution.  But there is no requirement—either in § 2 or in the district court's order—that a remedial map create additional majority-minority districts using only population from the specific districts Plaintiffs challenged.  Vote dilution claims are based on regions, not district lines, and indeed, it would make no sense to limit a state legislature to drawing within lines that were just held to be illegal.  In any

event, as the district court found, the additional majority-black districts are contained in whole or in large part within the previous lines of the districts that Plaintiffs challenged.

Plaintiffs also argue, incredibly, that the district court abused its discretion by accepting maps that had eliminated certain "crossover" districts—districts where black voters are in the minority but nevertheless elect preferred candidates because enough of the majority "crosses over" to support black-preferred candidates. In other words, the State broke up several white-majority districts that reliably voted for Democrats. But that is not a problem because the Supreme Court has specifically held that § 2 *does not* require crossover districts. *Bartlett v. Strickland*, 556 U.S. 1, 23 (2009). In an argument that can charitably be described as "brazen," Plaintiffs nevertheless assert that just because "Section 2 does not require crossover districts, does not … make crossover districts fair game for elimination in the course of a Section 2 remedy." Grant.Br.14. Of course, that is *exactly* what *Bartlett* makes clear. If § 2 does not require crossover districts, it cannot violate § 2 to *remove* them.

Plaintiffs' arguments here do little more than establish that, much as the Secretary has maintained throughout, their real concern is *partisanship*, not actual racial vote dilution. To say

3

that a State cannot eliminate crossover districts is just to say that a State cannot remove Democrat-leaning districts. But § 2 requires no such thing. The State here added exactly as many majority-black districts as the district court required, in the places the district court required them. Plaintiffs did not get the *partisan* victory they were hoping for, and now they complain to this Court to obtain what no law requires. Plaintiffs cannot use the Voting Rights Act to protect partisan political interests, and this Court should affirm.

## STATEMENT OF THE CASE

Following the 2020 census, Georgia enacted new electoral districting maps. Plaintiffs challenged those maps under § 2 of the Voting Rights Act, arguing vote dilution. The district court agreed and ordered the State to create two additional majority-black Senate districts in south metro Atlanta and five additional majority-black state House districts in various regions around the state. Doc. 294 at 509. The state legislature subsequently adopted remedial maps that did exactly that. After the district court found the 2023 remedial plans "fully complied with [its] order," Doc. 333 at 16, Plaintiffs filed this appeal of the district court's remedial order.

4

### A.  Factual background.

#### 1.  Georgia enacts new redistricting maps in the wake of the 2020 census.

On August 21, 2021, the Census Bureau released the population counts that Georgia and other states use to redraw their legislative districts.  Doc. 231 at 43.  Georgia then enacted new plans for federal and state legislative districts to comply with the new population requirements.  That process included guidelines adopted before plans were drawn, public input through hearings, use of an online portal for voter comments, and education from a variety of groups.  Doc. 294 at 40–44. Legislators began with "blind" legislative plans created by Georgia's mapdrawer, which were adjusted by each committee chair.  *Id*. at 45–46.  The adopted 56-member Senate plan was drawn with low population deviations, 29 county splits, 15 majority-black districts, and it did not pair any incumbents running for reelection.  *Id*. at 52–54.  The adopted 180-member House plan was drawn with low population deviations, 69 county splits, 49 majority-black districts, and it paired four sets of incumbents from both political parties.  *Id*. at 56–58.

5

### 2.    Plaintiffs challenge Georgia's maps.

Plaintiffs, a group of Georgia voters, challenged Georgia's new legislative maps under § 2 of the Voting Rights Act, arguing that several district lines diluted their votes.  Plaintiffs claimed Georgia failed to draw two majority-black Senate districts and three majority-black House districts in "the southern Atlanta metropolitan *area*" and "western Atlanta metropolitan *area*," focusing on certain districts to explain the area involved.  Doc. 118 at ¶¶ 3, 46, 48 (emphasis added).  Plaintiffs also sought additional majority-black Senate and House districts in east Georgia and in areas anchored in Bibb County, *id*. at ¶¶ 47, 49.

After years of litigation and a trial, the district court issued its order in October 2023, deciding that the configuration of several regions in the 2021 legislative and congressional plans violated § 2.[1]  The court enjoined the use of those plans in their entirety and gave the Georgia General Assembly until December 8, 2023, to create remedial plans.  Doc. 294 at 510, 514.

The district court gave specific instructions as to how to comply with its order: the new legislative plans had to include "two additional majority-Black Senate districts in south-metro

---

[1] That order is on appeal before this Court in the consolidated cases 23-13914, 23-13916, 23-13921.

6

Atlanta; two additional majority-Black House districts in south-metro Atlanta, one additional majority-Black House district in west-metro Atlanta, and two additional majority-Black House districts in and around Macon-Bibb." *Id.* at 509. It also ordered that Georgia not "eliminat[e] minority opportunity districts elsewhere in the plans." *Id.* at 510. Beyond that, the court imposed no other "parameters [or] instructions." *Id.* at 508.

### 3.    The legislature adopts remedial maps.

Governor Brian Kemp immediately called a special session of the state legislature to consider updated district boundaries. Both houses of the legislature followed a detailed process that aimed to comply with the district court's order while respecting traditional redistricting criteria like geography, keeping counties and municipalities whole, minimizing changes to existing district boundaries, and maintaining the existing partisan balance of the state legislature. *See, e.g.*, Doc. 326-3 at 9–24 (testimony of Senate Reapportionment and Redistricting Committee Chair); Doc. 326-4 at 19–27 (testimony of House Reapportionment and Redistricting Committee Chair). Ultimately, the legislature adopted remedial maps that created two additional majority-black Senate districts and five additional majority-black House districts in the regions specified by the district court.

7

a.    State Senate remedial plan

The Senate remedial plan increased the total number of majority-black districts by two and decreased the total number of majority-white districts by two.  Doc. 326-2, § 3.2.  The new majority-black districts are (a) District 17, which moves from 32.01% black voters[2] to 63.61% and (b) District 28, which moves from 19.51% black voters to 56.42%.  *Id.*  In creating the new majority-black districts, Senators consulted the illustrative plans drawn by Plaintiffs' experts, Mr. Cooper and Mr. Esselstyn.  Doc. 326-3 at 9–10, 13, 14–15; *see also* Doc. 294 at 515 ("[T]he General Assembly has an illustrative remedial plan to consult.").

Both new majority-black districts are located in south metro Atlanta—the region specified by the district court.  Indeed, the districts are all or mostly included within the borders of the previous districts that the district court found problematic.  The map below shows the Senate districts listed in the order in green and the two new districts in grey:

---

[2] Percentages refer to "Any-Part Black Voting Age Population" utilized by the district court.  *See* Doc. 294 at 32 n.14.



Doc. 326-2 at 20.

The new Senate districts also closely resemble the illustrative districts submitted by Plaintiffs. Senate District 17, for example, contains nearly 80% of the total population that was included in the Esselstyn Illustrative Senate District 25. Doc. 326-2, § 3.5.

Overall, the Senate remedial plan increases the number of black individuals of voting age who live in majority-black districts. On the 2021 Senate plan, 49.7% of black individuals of voting age in Georgia lived in a majority-black district. Doc. 326-2, § 3.3. On the Senate remedial plan, 53.5%% of black individuals of voting age in Georgia now live in a majority-black district. *Id*. In looking

at just the districts the district court identified as setting the area of § 2 violations, the percentage of black individuals of voting age living in a majority-Black district also increases on the Senate remedial plan. *Id.* at § 3.3.

      b.   State House remedial plan

The remedial state House plan increased the number of majority-black districts by five and decreased the number of majority-white districts by five. Doc. 326-2, § 4.2. The new majority-black districts are (a) District 64 (west metro Atlanta), which has 52.43% black voters; (b) District 74 (south metro Atlanta), which has 66.0%; (c) District 117 (south metro Atlanta), which has 62.93%; (d) District 145 (metro Macon), which has 50.30%; and (e) District 149 (metro Macon) which has 50.03%. Doc. 326-2, § 4.2, Table 9.

   In creating the new districts, the House committee chair consulted the boundaries of the illustrative plans created by Plaintiffs' experts Mr. Cooper and Mr. Esselstyn. Doc. 326-4 at 21–23; *see also* Doc. 294 at 515. As a result, the new districts include much of the population from the districts Plaintiffs relied on at trial.

For example, House District 74, in south metro Atlanta, contains 80.8% of the population that was included in Cooper

Illustrative House District 74.  Doc. 326-2, § 4.5, Table 12.  The House committee chair specifically explained that he consulted the Plaintiffs' expert's district for that configuration.  Doc. 326-4 at 21.  Likewise, House District 117, also in south metro Atlanta, includes nearly 70% of the population included in Esselstyn Illustrative House District 117.  Doc. 326-2, § 4.5, Table 12.

Districts 74 and 117 (shown in grey on the right) are also located in the region of the districts identified by the district court in its order (green):



Doc. 326-2, § 4.5, Figure 4.

District 64, in west metro Atlanta, contains more than half of the total population that was included in the Esselstyn Illustrative House District 61.  Doc. 326-2, § 4.4.  District 64 (shown in grey on the right) is also located in the region of districts identified by the district court in its order (green):



Doc. 326-2, § 4.4, Figure 3.

In the Bibb County area, Districts 145 and 149 include significant portions of the population included in the Esselstyn versions of Macon.  Doc. 326-2, § 4.6, Table 13.  The remedial maps differ from Plaintiffs' illustrative maps, however, because the House committee chair conformed the remedial districts to

precinct boundaries and highways, which allowed the legislature to avoid changing the existing split of Baldwin County.  Doc. 326-4 at 22–23.  With remedial Districts 145 and 149, there are now four majority-black districts that are anchored in the Macon area: Districts 142, 143, 145, and 149.  Doc. 326-2, § 4.2, Table 9.  The new districts (shown in grey below) are also located in the same region as districts identified by the district court in its order:



Doc. 326-2, § 4.6, Figure 5.

Overall, the House remedial plan increases the number of black individuals of voting age who live in majority-black districts. On the 2021 House plan, 53.5% of black individuals of voting age in Georgia lived in a majority-black district.  Doc. 326-2, § 4.3.  On the House remedial plan, 56.6%% of black individuals of voting

age in Georgia now live in a majority-black district. *Id*. In looking at just the districts the lower court identified as setting the area of § 2 violations, the percentage of black individuals of voting age living in a majority-black district goes from 53.7% to 74.3% under the House remedial plan. *Id*.

### 4. The district court determines that the remedial maps "fully complied" with its order.

Although the remedial maps produced precisely the number of new majority-black districts required by the district court's order—in the areas identified by the district court—Plaintiffs nevertheless challenged these maps as well. The district court set a schedule for consideration of objections from Plaintiffs. Doc. 309. After Plaintiffs filed objections, the Secretary responded, and the court held an evidentiary hearing.

Plaintiffs' expert agreed that Georgia had added two new majority-black Senate districts and five new majority-black House districts. Doc. 317-1 at ¶ 7. But Plaintiffs made two primary objections. First, they claimed that the new majority-black districts included voters from outside of the list of districts the district court identified in its merits order. Doc. 317 at 7–13. Plaintiffs claimed that the creation of the new majority-black districts "deprive[d] those whose Section 2 rights have been

14

violated from the Section 2 remedy to which they are entitled." *Id.* at 14.

Second, Plaintiffs objected to the elimination of majority-white districts that were previously electing Democratic members of the legislature. Doc. 317 at 16–17. While carefully avoiding the term "Democrat," Plaintiffs relied on their expert's report that white-majority districts that had previously elected "Black-preferred candidates" had been eliminated. *Id.* Plaintiffs claimed that eliminating these majority-white districts eliminated "minority opportunity districts" in violation of the district court's order. *Id.* at 18–19.

At the hearing, Plaintiffs pressed both arguments despite the district court explaining that the term "minority opportunity district" in its order referred only to majority-black districts. Doc. 329 at 7–8. Plaintiffs argued that, in their view, Georgia had eliminated one black opportunity district for every majority-black district it added. Doc. 330 at 43. They likewise emphasized that the legislature went beyond what they called the "vote dilution area" when creating new majority-black districts. *Id.*

The district court rejected Plaintiffs' arguments. The court issued its remedial order, which is the subject of this appeal, finding "that the General Assembly fully complied with [its] order

requiring the creation of Black-majority districts in the regions of the State where vote dilution was found." Doc. 333 at 16. The district court specifically rejected Plaintiffs' argument that Georgia was confined to drawing new majority-black districts entirely within the confines of the districts it had listed as dilutive in its order. *Id*. at 7–8. As the court explained, it identified specific districts to establish the general *areas* where vote dilution had occurred, not to limit the discretion of the legislature in placing districts in those areas. *Id*. at 8 (emphasis added). The court then specifically found that the new districts were added in the regions identified by the court. *Id*. at 8–12.

The district court next rejected the crossover district objection. It explained that "the very definition" of white-majority crossover districts "removes [them] from Section 2 protection." *Id*. at 14. As a result, "dismantling of any alleged crossover districts by the State in creating the 2023 Remedial Plans did not violate this Court's order." *Id*.

### B. Standard of review.

The district court's order on remedial redistricting plans is reviewed for abuse of discretion. *Godfrey v. BellSouth Telecoms*., 89 F.3d 755, 757 (11th Cir. 1996); *see also Large v. Fremont County*, 670 F.3d 1133, 1139 (10th Cir. 2012); *Bone Shirt v.*

16

*Hazeltine*, 461 F.3d 1011, 1017 (8th Cir. 2006); *Rodriguez v. Bexar County*, 385 F.3d 853, 870 (5th Cir. 2004).  This is especially true when evaluating a legislatively enacted redistricting plan because it is the product of a "complex interplay of forces," and "the good faith of a state legislature must be presumed." *Miller v. Johnson*, 515 U.S. 900, 915–16 (1995).  And "[a] reapportionment plan enacted by a state legislative body . . . is not scrutinized by the exacting standards used in evaluating a judicially imposed plan." *Tallahassee Branch of NAACP v. Leon County*, 827 F.2d 1436, 1438 (11th Cir. 1987).

Further, the order on the remedial redistricting plans involves a district court interpreting its own order, which is also reviewed for abuse of discretion.  *Alley v. United States HHS*, 590 F.3d 1195, 1202 (11th Cir. 2009) (citing *Cave v. Singletary*, 84 F.3d 1350, 1354–55 (11th Cir. 1996)).

## SUMMARY OF ARGUMENT

The question on appeal is whether the district court abused its discretion when it found that Georgia's remedial redistricting maps complied with the district court's own order.  It plainly did not.  Georgia produced the additional majority-black districts, precisely where the district court required them.  And Georgia did

not violate § 2 by dismantling crossover districts, which § 2 does not protect or require.

**I.** "Redistricting constitutes a traditional domain of state legislative authority." *Alexander*, 144 S. Ct. at 1233; *see also Bush v. Vera*, 517 U.S. 952, 978 (1996). Striking the right balance in this "complex interplay of forces" is a fundamentally legislative task. *Miller,* 515 U.S. at 915–16. And "[i]nherent in any redistricting remedy" is the reality that some voters will be in districts where they are part of a political minority. *McGhee v. Granville County*, 860 F.2d 110, 118 n.9 (11th Cir. 1988). The State certainly need not "draw the precise compact district that a court would impose in a successful § 2 challenge." *Vera*, 517 U.S. at 977–78 (quotation omitted).

That is why, here, the district court ordered the creation of majority-black districts in metro Atlanta and Macon-Bibb but *did not* order any particular lines or limit the State's ability to otherwise draw the district as it saw fit. The district court identified the *region* where the additional majority-black districts must be, but it did not purport to go any further. Doc. 294 at 509.

Georgia's remedial maps plainly satisfy the district court's order. The order required the State, as relevant here, to create seven additional majority-black Senate and House districts in

18

certain areas of Atlanta and Macon-Bibb, without removing any majority-black districts. *Id*. at 509. That is precisely what Georgia did and precisely what the district court *found* the State to have done. A quick eyeball test shows that the district court was correct: the new majority-black remedial districts are "in the regions of the State where vote dilution was found." Doc. 333 at 16.

If nothing else, the district court did not *abuse its discretion* in making that finding. Even if it were debatable whether the districts are correctly located, this is exactly the sort of on-the-ground factual question that is within the ken of the district court.

**II.** Plaintiffs' alternative argument boils down to the assertion that Georgia was not allowed to dismantle so-called "crossover districts," where the majority votes with the minority in sufficient numbers to elect minority-preferred candidates. But there are two insurmountable problems with this argument.

First, the district court did not prohibit the State from eliminating crossover districts—it explicitly required only that the State refrain from eliminating majority-black districts. Doc. 329 at 7–8. Second, and more important, the district court could not have required the maintenance of crossover districts because the Supreme Court has held that "§ 2 does not mandate creating *or*

*preserving* crossover districts." *Bartlett*, 556 U.S. at 23 (emphasis added). Rather, crossover districts are "a matter of legislative choice or discretion." *Id.* Plaintiffs cannot circumvent *Bartlett*.

At the end of the day, this entire dispute comes down to partisan preferences. Plaintiffs wanted the State to shift district lines in ways that would benefit Democrats, and the State instead chose to benefit Republicans. Plaintiffs got what they were entitled to (new majority-black districts); they have no claim to what they want (new majority-Democrat districts). This Court should affirm.

## ARGUMENT

### I.  The remedial maps satisfy the district court's order.

The district court's remedial instructions in this case were simple. It required the State to create two additional majority-black Senate districts in south metro Atlanta and five additional majority-black House districts across south metro Atlanta, west metro Atlanta, and Macon-Bibb. Doc. 294 at 509. And it ordered the map drawers not to "eliminat[e] minority opportunity districts elsewhere in the plans." *Id.* at 510. Beyond that, the court imposed no other "parameters [or] instructions." *Id.* at 508.

The State's remedial maps satisfy the district court's order. Remedial Senate Districts 17 and 28 are new majority-black

20

districts in south metro Atlanta.  Doc. 333 at 9.  Remedial House Districts 74 and 117 are new majority-black districts in south metro Atlanta.  *Id.* at 10.  Remedial House District 64 is a new majority-black district in west metro Atlanta.  *Id.* at 11.  And remedial House Districts 145 and 149 are new majority-black districts in the Macon-Bibb area.  *Id.* at 12.  The State did not eliminate any majority-black districts "elsewhere in the plan" to reach that result.  Doc. 294 at 510.

Of course, Plaintiffs prefer different remedial maps.  But States have broad discretion in crafting remedial districts, and federal courts should not "conduct a beauty contest between plaintiffs' maps and the State's."  *Allen v. Milligan*, 599 U.S. 1, 21 (2023).  As long as the State's remedial maps comply with the district court order and do not themselves violate § 2, they are sufficient.  *See Wise v. Lipscomb*, 437 U.S. 535, 540 (1978).  And no one, even Plaintiffs, thinks the remedial maps fail to include the required number of majority-black districts.

**A.  The district court was correct to approve the State's remedial maps, and it certainly did not abuse its discretion.**

**1.** As the Supreme Court reiterated this past term, "[r]edistricting constitutes a traditional domain of state legislative

21

authority." *Alexander*, 144 S. Ct. at 1233; *see also Vera*, 517 U.S. at 978 (the State has a "sovereign interest in implementing its redistricting plan"). Drawing electoral districts is a complicated process that requires balancing a wide array of sometimes conflicting factors: preserving county and municipal boundaries, adhering to natural geography, keeping communities of interest intact, and designing compact and contiguous districts. *See, e.g.*, *Bethune-Hill v. Va. State Bd. of Elecs.*, 580 U.S. 178, 183 (2017) (describing these "traditional redistricting factors"); *Vera*, 517 U.S. at 1048 (Souter, J., dissenting) (collecting cases that "accorded substantial respect" to the States' reliance on such factors). It is also "an inescapably political enterprise." *Alexander*, 144 S. Ct. at 1233. Legislatures are "almost always aware of the political ramifications of the maps they adopt," and they are free to consider partisan interests—protecting incumbents or conferring advantages to one party over another—when redistricting. *Id.* at 1233, 1235; *see also Rucho v. Common Cause*, 588 U.S. 684, 706–07 (2019).

Striking the right balance in this "complex interplay of forces" is a fundamentally legislative task. *Miller*, 515 U.S. at 915–16; *Seastrunk v. Burns*, 772 F.2d 143, 151 (5th Cir. 1985) ("It is the legislature's function to make decisions of basic political policy.").

Federal courts, by contrast, have no "legal standards" to evaluate such policy-laden judgments. Doc. 333 at 15 (citing *Rucho*, 139 S. Ct. at 2501; *Seastrunk*, 772 F.2d at 151). Which is why, "time and again," the Supreme Court has instructed that, absent a violation of federal law, federal courts must defer to a state legislature's redistricting choices. *Voinovich v. Quilter*, 507 U.S. 146, 156 (1993); *see also, e.g.*, *Tallahassee Branch of NAACP*, 827 F.2d at 1438; *Seastrunk*, 772 F.2d at 151. States, in other words, are entitled to "broad discretion in drawing districts to comply with the mandate of § 2." *Shaw v. Hunt*, 517 U.S. 899, 917 n.9 (1996).

That is especially true when, as here, the parties do not dispute *whether* new districts must be drawn, only what the precise boundaries of those new districts should be. Redistricting, after all, is an "inevitably rough-hewn" and "approximate" process. *McGhee*, 860 F.2d at 119. Creating new districts necessarily requires adjustments to adjacent districts. And the competing factors at play in the redistricting calculus (geography, local government boundaries, partisan interests) mean that some voters will invariably be left in districts where they are part of the political minority. *League of United Latin Am. Cit. v. Perry*, 548 U.S. 399, 503–04 (2006) (Roberts, C.J., concurring) (*LULAC*). That is "[i]nherent in any redistricting remedy." *McGhee*, 860

F.2d at 118 n.9.  Indeed, the district court made that very observation in this case.  *See* Doc. 333 at 13 (Some "members of the minority group" will inevitably end up "outside of the [new] minority-controlled districts.").

Federal courts, therefore, do not delineate the specific boundaries of the remedial districts States must create to cure a § 2 violation.  *See Vera*, 517 U.S. at 977–78 (the State need not "draw the precise compact district that a court would impose in a successful § 2 challenge" (quotation omitted)); *Clark v. Calhoun County*, 88 F.3d 1393, 1407 (5th Cir. 1996) ("[The State] is free … to develop a different remedial plan from those proposed by the plaintiffs.").  Of course, the district court must identify the region in which vote dilution has been found and the remedial district should be located, but it cannot "confine the General Assembly to working only within [certain] enumerated districts."  Doc. 333 at 8.

In sum, then, upon a finding of vote dilution, States are free to adopt *any* remedial map, as long as that map creates the required majority-black districts in the region identified by the district court.

**2.**  The State's remedial maps satisfy that standard, and the district court did not abuse its discretion in so finding.   To

24

reiterate, the district court's order, as relevant here, required Georgia to create two additional majority-black Senate districts and five additional majority-black House districts around metro Atlanta and the Macon-Bibb area. Doc. 294 at 509. And that is *all* it required. It did not specify exactly where in the identified regions the new districts must be placed or exactly which *existing* districts must be adjusted to accommodate the new districts.

Remedial Senate Districts 17 and 28 and remedial House Districts 74 and 117 are all located squarely within the south metro Atlanta area. Doc. 333 at 9–10. Likewise, remedial House District 64 is anchored in west metro Atlanta, *id.* at 11, and remedial House Districts 145 and 149 are well within the Macon-Bibb area, *id.* at 12. In fact, although the General Assembly was not required to create the new districts within the specific districts held to be problematic, the remedial districts largely overlap with those boundaries, as the maps show:



Doc. 326-2, § 3.4, Figure 1.



Doc. 326-2, § 4.5, Figure 4.



Doc. 326-2, § 4.4, Figure 3.



Doc. 326-2, § 4.6, Figure 5.

There is nothing else the legislature was required to do.  The district court's liability order held that the State's 2021 legislative maps diluted the votes of black voters because the Atlanta and Macon-Bibb metro areas could, but did not, include additional majority-black districts.  Doc. 294 at 509.  The remedial map "completely remedies" that violation by adding the required majority-black districts in those metro areas.  *U.S. v. Dallas County Comm'n*, 850 F.2d 1433, 1437–38 (11th Cir. 1988).

**3.**  Even if that finding were arguable, the Secretary prevails anyway because the district court *found* that the State's remedial map "fully complied" with its order.  Doc. 333 at 16.  Its instruction to create new majority-black districts in west and south metro Atlanta and in the Macon-Bibb metro area, explained the court, "did not … confine the General Assembly to working only within the" districts in those areas identified by the district court as vote-dilutive.  *Id.* at 8.  Rather, that instruction was "geographic guidance" indicating the general area in which the new districts should be placed.  *Id.*  And the remedial maps followed that guidance.  *Id.* at 16 (finding the State created the new districts "in the regions of the State where vote dilution was found").

A district court's interpretation of its own order is reviewed with deference. Its decision will be reversed only if its interpretation constituted an abuse of discretion. *Alley,* 590 F.3d at 1202. The district court, after all, "is in the best position to interpret its own orders." *Id.* As long as its reading is "reasonable," the decision will stand. *Cave*, 84 F.3d at 1354. And no one could seriously maintain that it was unreasonable for the district court to interpret "west-metro Atlanta," "south-metro Atlanta," and "in and around Macon-Bibb," Doc. 294 at 509, to mean the "regions" of "west-metro Atlanta," "south-metro Atlanta," and "in-and-around Macon-Bibb" rather than an arbitrary collection of specific legislative districts within those regions, Doc. 333 at 8.

Plaintiffs disagree with the district court and argue that Georgia failed to create additional majority-black districts in the areas specified by the district court's order, Grant.Br.8–9, but this underdeveloped argument makes little sense. The district court specifically *found the opposite*, Doc. 333 at 16, and the question whether a district is located in a particular area is the sort of factual question where the district court receives deference. Even if, for example, someone might disagree about *precisely* where west or south metro Atlanta is (and here there should not be much

disagreement), the district court's finding on that point must be respected.

Simply put, Georgia complied with the district court's order, the district court found that Georgia complied with the order, and even if one disagreed with those conclusions, it was not an abuse of discretion for the district court to so find.

### B.   Plaintiffs' counterarguments hold no weight.

Plaintiffs devote some (though not much) of their brief to arguing that Georgia's remedial discretion should be more limited. *See* Grant.Br.8–13.  They would require the State to create additional majority-black districts using *only* the population from the specific districts identified in the district court's initial order— what Plaintiffs call the "vote dilution area."  *See, e.g.*, Grant.Br.8–9 (arguing that the district court erred in authorizing a map where the additional majority-black districts "only *partially* draw from these specified areas").  But as the district court explained, there is "no relevant authority to support this view," Doc. 333 at 8, and it is not what the district court ordered.

1.  **Nothing in § 2 limits the State to creating majority-black districts within the unlawful, prior district lines.**

Plaintiffs erroneously insist that the new majority-black districts created by the General Assembly are insufficient because they are not contained entirely within the "vote dilution area" identified by the district court in its initial order. *See, e.g.*, Grant.Br.11. On Plaintiffs' view, a vote dilution remedy is "complete" only if the new majority-black district is comprised of voters who previously resided in the dilutive districts. *Id.* at 12.

Not so. Section 2 is concerned with *regions*, not particular *districts*. That much is inherent in how § 2 vote dilution claims work. Unlike racial gerrymandering claims, which challenge specific district boundaries, *see U.S. v. Hays*, 515 U.S. 737, 745 (1995), vote dilution claims do not challenge the boundaries of any particular electoral district. Instead, they challenge the lack of majority-minority districts in the "area *as a whole*." *LULAC*, 548 U.S. at 504 (Roberts, C.J., concurring in part and dissenting in part) (emphasis added). In fact, unlike a racially gerrymandering plaintiff, a vote dilution plaintiff doesn't even have to live in a particular district to bring such a claim; he need only live in "a reasonably compact *area* that could support additional majority-minority districts." *Thompson v. Kemp*, 309 F. Supp. 3d 1360,

31

1364–65 (N.D. Ga. 2018) (three-judge court) (emphasis added); *see also Luna v. County of Kern*, 291 F. Supp. 3d 1088, 1122 n. 14 (E.D. Cal. 2018) (collecting cases). By the same token, to *remedy* vote dilution, the State need not adjust or be confined to the boundaries of any particular districts; it must ensure that the identified *area* has the required number of majority-minority districts.

Plaintiffs' argument to the contrary lacks authority or even common sense. They insist that the State must confine its remedial districts to the boundaries of the dilutive districts identified in the district court's order. Grant.Br.8–9. But those boundaries were set by maps that the district court held to be illegal—at Plaintiffs' own insistence from the list in their complaint. Doc. 294 at 511–14; Doc. 333 at 8. Why should the State, or any remedial map-drawer, be required to use, as a template for designing a new district, an unlawful map? Indeed, Plaintiffs' own illustrative maps presented at trial include proposed majority-black districts that extend beyond those boundaries. *Compare* PX 1 at 27 (Figure 15) *with* Doc. 317-1 at 20–21 (House Districts 74 and 117); PX 1 at 14 (Figure 7) *with* Doc. 326-2 at 20 (Figure 1) (Senate District 28).

32

Plaintiffs mistakenly argue that *Shaw*, 517 U.S. at 899, requires States to remedy vote dilution by adjusting the particular electoral districts identified by a district court. *See* Grant.Br.9– 10. The decision says nothing of the sort. For one thing, *Shaw* was not even a § 2 case; it was a racial gerrymandering case. The Department of Justice refused to preclear North Carolina's redistricting map under § 5 of the Voting Rights Act. The proposed map, said the Department, diluted minority voting strength in the south-central to southeastern portions of North Carolina, in violation of § 2. North Carolina responded by revising the proposed map to include a new, plainly gerrymandered majority-black district. *Shaw,* 517 U.S. at 917. The Supreme Court rejected the argument that this supposed attempt at compliance with § 2 could justify the obvious racial gerrymander. For one, the district was not remotely compact, and § 2 requires creation of majority-minority districts only where they could be compact. *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). For another, its proposed district was nowhere near the area of supposed vote dilution concern, nor could it be because it was so strung out it was not limited to any particular region at all:



*Reproduced at Shaw v. Reno*, 509 U.S. 630, 659 (1993) (red line added for emphasis); Doc. 326 at 35.  So the "black voters of the south-central to southeastern region would still be suffering precisely the same injury that they suffered before District 12 was drawn." *Shaw,* 517 U.S. at 917.  That, explained *Shaw*, was not a valid remedy; the State could not fix vote dilution in one part of the State by creating a new majority-minority district on the other side of the State.  *Id.*

This case is the polar opposite of *Shaw*.  The remedial districts adopted by the General Assembly here do not stretch to the other side of the State.  Quite the opposite: they are compact and contained entirely within the metro Atlanta and Macon-Bibb

areas.  And that is exactly the kind of remedy *Shaw* says § 2 requires.  *See id.* at 917–18 (explaining that vote dilution is cured when the remedial district includes a "substantial portion" of the affected minority voters).

To make the same argument, Plaintiffs briefly cite *LULAC*, 548 U.S. at 399, *see, e.g.*, Grant.Br.10–11, but that case works against them.  Plaintiffs cite *LULAC* for the proposition that "the State's creation of an opportunity district for those without a § right offers no excuse for its failure to provide an opportunity district for those with a § 2 right."  *Id.* at 11 (quotation omitted).  But *LULAC* said as much in the context of explaining that a state cannot make a *non-compact* majority-minority district in one part of the state to offset the loss of a *compact* majority-minority district elsewhere in the state. *LULAC,* 548 U.S. at 430–31.  The Court's point was that, "since there is no § 2 right to a district that is not reasonably compact," the "creation of a noncompact district does not compensate for the dismantling of a compact opportunity district."  *Id.*  In other words, Georgia could not create a non-compact majority-black district in Augusta to justify "dismantling" a compact majority-black district in Atlanta.

Here, Georgia did not dismantle *any* majority-black districts, much less compact majority-black districts.  The General

35

Assembly created the additional districts Plaintiffs wanted, in the areas the district court required, while not removing any majority-black districts elsewhere.  Plaintiffs, for their part, have not offered any alternative remedial plans with more majority-black districts in the Atlanta or Macon-Bibb areas.  Indeed, their own expert acknowledges that the legislature created the additional majority-black districts.  Doc. 317-1 at ¶ 7.

*LULAC* instead rebuts Plaintiffs' argument.  The Court rejected the idea that "a § 2 plaintiff has the right to be placed in a majority-minority district once a violation of the statute is shown." *LULAC*, 548 U.S. at 429 (quotation omitted).  And it explained that "[i]f the inclusion of the plaintiffs would necessitate the exclusion of others, then the State cannot be faulted for its choice." *Id.* at 429–30.  Yet that is what Plaintiffs argue here: they "fault[]" the State for choosing to put certain black voters in majority-black districts as opposed to others.  *LULAC* confirms that where the State creates the required number of compact majority-black districts, Plaintiffs are entitled to no more.

Next, Plaintiffs turn to *McGhee*, 860 F.2d at 110, to argue that a redistricting remedy is "complete" only if it "align[s]" with (i.e., places as many black voters in majority-black districts as) the Plaintiff's illustrative maps, Grant.Br.12.  But *McGhee* stands for

36

the opposite proposition.  The opinion acknowledged the uncontroversial truth that any remedy that places the "maximum" number of black voters in majority-black districts is necessarily a "complete" remedy.  860 F.2d at 118.  But there is always "the possibility," the court went on, "that not all can be placed in safe districts."  *Id*. at 118 n.9.  And the decision in fact reversed a district court for rejecting the county's redistricting scheme because, although it created the maximum possible number of majority-black districts, it left many black voters outside of those districts.  *Id*. at 113, 118–19.  In other words, *McGhee* rejected the very argument Plaintiffs press here.

Plaintiffs purport to acknowledge that States have some leeway when redrawing districts to remedy vote dilution.  *See* Grant.Br.12 (conceding that "the inevitably rough-hewn" redistricting process "will result in *some* members of the minority group residing outside of the minority-controlled districts" (quotation omitted)).  But they misread the relevant caselaw to arbitrarily limit that discretion to working within the *old* (now unlawful) districts.  *Id*. at 8–12.  That is not what § 2 requires.  Absent a choice that is either unconstitutional or otherwise illegal under federal law, States have broad discretion to craft new remedial districts.  *Voinovich,* 507 U.S. at 156.

37

### 2. Regardless, the district court did not order such relief.

Ultimately, Plaintiffs' legal contentions are irrelevant at this stage of the litigation.  Even if one were sympathetic to their arguments about what the district court *should have* required, none of this is what the district court ordered.  The district court outlined "the parameters and the instructions around what the State of Georgia [was] supposed to do" to cure supposed vote dilution in south metro Atlanta.  Doc. 294 at 508–09.  The court required additional majority-black districts in west and south metro Atlanta and in and around Macon-Bibb.  *Id.* at 509.  It also acknowledged the State's discretion in crafting appropriate remedial maps, noting that "redistricting … is a legislative task." *Id.* (quoting *Wise*, 437 U.S. at 539).  And it specifically *declined* to delineate exactly where and with which voters the remedial districts must be drawn.  *Id.* (explaining that it would be "[in]appropriate … for the federal court to devise its own plan" (quoting *Wise*, 437 U.S. at 540 (alteration adopted))).

In other words, the district court *did not* order the relief Plaintiffs now argue for.  In fact, it went on to say exactly that in its remedial order.  *See, e.g.*, Doc. 333 at 7–8 ("reject[ing]" Plaintiffs' "foundational assumption" that "the State was confined to making changes only in [specific] districts").

38

If Plaintiffs were unhappy with the district court's order, or if they thought it did not conform to the requirements of § 2, then they could have cross-appealed and asked this Court to modify the order. But they chose not to do so. Thus, even if they were somehow correct—and they are not—that the district court *should have* imposed stricter limits on the State's remedial discretion, that argument is beyond the scope of this appeal. *See Justice for All v. Faulkner*, 410 F.3d 760, 772 (5th Cir. 2005) ("Because [the plaintiff] did not cross-appeal from the district court's judgment, however, we lack jurisdiction to expand the scope of the remedy ordered."). The State complied with the terms of the district court's order, and that should be the end of it.

## II. The district court correctly ruled that the legislature was not required to maintain "crossover districts."

Plaintiffs' second argument is even briefer than their first, and just as meritless. They assert that, when the district court instructed the State not to "eliminat[e] minority opportunity districts elsewhere in the plans," Doc. 294 at 509–10, the court prohibited the State not just from eliminating majority-black districts, but from altering *any* district that tends to elect black-preferred candidates (i.e., Democrats). Grant.Br.13–16. So, they argue, the State violated the district court's order (and § 2) when

39

it reshaped five "crossover" districts—districts that tend to elect black-preferred candidates even though black voters are not the majority—to accommodate the new majority-black districts. *Id.* at 14–15.

This argument is a non-starter. When the district court said "minority opportunity districts," it meant *majority-black* districts, as the court itself confirmed. Doc. 333 at 14; Doc. 329 at 7–8. Plus, the district court *could not* have required the State to maintain crossover districts, as § 2 does not require them. As the Supreme Court held explicitly, the statute protects districts where a "minorit[y] make[s] up more than 50 percent of the voting-age population" and can elect a candidate on its own. *Bartlett,* 556 U.S. at 18 (2009) (plurality op.). It does not protect "a minority group's right to form political coalitions" in districts where they are *not* the majority. *Id.* at 15.

## A.   The district court did not require the State to preserve crossover districts.

Plaintiffs start by arguing that the district court, in "letter and spirit," prohibited the General Assembly from eliminating crossover districts in its remedial plans. Grant.Br.13. The district court said nothing of the kind. It held that, in the course of instructing Georgia to create "additional *majority-Black*" districts,

that the State could not accomplish that goal by eliminating "minority opportunity districts *elsewhere*" in the State.  Doc. 294 at 509–10 (emphasis added).  In other words, the State could not eliminate "a safe majority-black district somewhere else in the State," *Shaw*, 517 U.S. at 917, to remedy the lack of such districts in metro Atlanta or Macon-Bibb.

Nothing in the district court's order indicates that it used "minority opportunity district" to refer to crossover districts.  And Plaintiffs, for their part, point to nothing in the order suggesting that meaning.  To the contrary, the district court has repeatedly *told the parties* that "minority opportunity district" means majority-black district.

At the remedial hearing, the district court clarified that the term referred only to majority-black districts.  Doc. 329 at 7–8. Then, in the remedial order on appeal here, the district court explained again that "minority opportunity districts" simply "could not" refer "to crossover districts" because "this case has, from the outset, been about Black voters."  Doc. 333 at 14; *see also* Doc. 96 at 33–36.  Indeed, as the district court noted, all of the evidence presented and all of the court's findings were on black voter cohesion, not "Black voters-plus-another racial group."  Doc. 333 at 14.

41

Of course, the district court is correct: no part of this litigation has touched on crossover voting. [3] And nowhere in its order did the district court even mention the "crossover" districts about which Plaintiffs now complain. Regardless, the district court's interpretation of its own language is entitled to the utmost deference. Its decision on that score can be reversed only if its reading is unreasonable. *Alley*, 590 F.3d at 1202, 1207; *Cave*, 84 F.3d at 1354 (reviewing for abuse of discretion). And Plaintiffs do

---

[3] All three cases that were tried together only involved black voters in Georgia. *See, e.g.* Doc. 294 at 9 ("the Court determines that in certain areas of the State, the political process is not equally open to Black voters."); 96, 107 (*APA* expert Cooper legislative plans involved majority-black districts); 115 (*Grant* expert Esselstyn only considered black population); 142 (*Grant* expert Palmer only evaluated black and white voter cohesion, not other minority groups); 149 (*APA* expert Handley only evaluated black and white voter cohesion, not other minority groups); 201 (in *Pendergrass* reference to minority community was to black voters); 209, 211 (question in *Pendergrass* case was equal openness of process as to "affected Black voters"); 242 (electoral structure was found to affect black voters); 272–273 (findings as to black voters); 274 (question in *APA* and *Grant* cases was equal openness of process to black voters); 405–406 (findings regarding black community in context of Section 2 violation); 426–427 (question in *APA* and *Grant* cases was equal openness of process as to "affected Black voters"); 510 (injury was to "Plaintiffs and other Black voters in Georgia"); 511 (remedy will be assessed to determine "whether it provides Black voters with an additional opportunity district").

not (nor could they) argue that it was unreasonable for the district court to read "minority opportunity districts" in its earlier order to refer to majority-black districts.

### B.   Crossover districts are not protected by Section 2.

On top of everything else, the district court *could not* have protected crossover districts.  The Supreme Court has already rejected that argument, and for good reason.

**1.**  In *Bartlett*, the Supreme Court squarely addressed and rejected Plaintiffs' argument that a State must maintain or at least be cognizant of crossover districts.  There, a controlling plurality of the Court held that "crossover districts" are beyond the reach of § 2 because the statute is designed only to ensure that minorities have the same "opportunity" as "other members of the electorate" to elect their preferred representatives.  *Bartlett,* 556 U.S. at 14.  And when a racial minority is not the *majority* in a district, it "has no better or worse opportunity to elect a candidate than does any other group of voters" in the district.  *Id.*  The minority group could of course "join other voters" to "reach a majority and elect their preferred candidate"—as could any racial group in the district—but they cannot do so "based on their own votes and without assistance from others."  *Id.*  Affording § 2 protection to such situations would not be guaranteeing equal

opportunity; it would be guaranteeing the minority a leg up, giving "special protection to [their] right to form political coalitions" and relieving them of the usual "obligation to pull, haul, and trade to find common political ground." *Id.* at 15 (quotation omitted).

As a practical matter, any other rule would be arbitrary or impossible. What portion of a district's population, for example, must be comprised of minority voters to be considered a "crossover" district as opposed to a traditional majority-white district that simply happens to elect black-preferred candidates: 10%? 25%? 45%? Assuming that threshold is met, how frequently must the minority-preferred candidate win to prove that the minority's effective majority is enduring: Some elections? Most elections? All elections? Unlike the "objective, numerical test" provided by the majority-minority rule, the crossover district rule offers no clear answer to these questions. *Bartlett*, 556 U.S. at 18.

Moreover, to demand the maintenance of crossover districts in this particular case would be hypocrisy in the extreme. The district court rejected the Secretary's argument at trial that black voters in Georgia "have proportional representation in the General Assembly because 43% of the State House and 41% of the State

44

Senate are Democrats, which is the Black-preferred candidate."
Doc. 294 at 478.  If plaintiffs can use § 2 to prevent a State from
eliminating or altering crossover districts, then States could point
to such districts to *defend* against vote dilution claims.  *Bartlett*,
556 U.S. at 24 (observing that a State could "poin[t] to crossover
voting patterns" to "defend against alleged § 2 violations").  But if
those districts do not count in favor of the State at the liability
stage, they cannot be protected from alteration at the remedial
stage.

In sum, Plaintiffs' crossover district theory runs directly
counter to well-established Supreme Court precedent and makes a
mess of § 2.  This Court should reject the argument.

**2.**  Plaintiffs' attempt to circumvent *Bartlett* is bold but
nonsensical.  Plaintiffs assert that, even though "Section 2 does
not require crossover districts, [that] does not … make crossover
districts fair game for elimination in the course of a Section 2
remedy."  Grant.Br.14.  To state this argument is to refute it.  If
§ 2 does not require crossover districts, it does not require
crossover districts.

Plaintiffs mention *Cooper v. Harris*, 581 U.S. 285 (2017),
Grant.Br.14, but that decision confirms the futility of their
argument.  *Cooper* observed that a § 2 plaintiff could not prove

45

vote dilution in a district with crossover voting because, when substantial numbers of white voters are voting *with* the minority, it is impossible to establish the third *Gingles* precondition: white bloc voting against the minority's preferred candidates. *Id.* at 305–06. That crossover districts are less liable to *attack* under § 2 does not mean they are *required* by § 2.

Regardless, *Bartlett* left no room for confusion on this matter. It held that "§ 2 does not mandate creating *or preserving* crossover districts." 556 U.S. at 23 (emphasis added). Rather, crossover districts are "a matter of legislative choice or discretion." *Id.*

As with nearly every corner of this case from the beginning, Plaintiffs' argument boils down to partisan preference masquerading as a § 2 claim. Put simply, Plaintiffs are asking this Court to entrench existing Democratic districts (majority-white crossover districts) while requiring the creation of *new* Democratic districts (majority-black districts). But that is not how § 2 works. In its own words, the statute is meant to protect voters from electoral disadvantage "on account of race," 52 U.S.C. § 10301(a), not provide a leg up for political coalitions simply because one part of the coalition happens to be a racial minority. *See Nixon v. Kent County,* 76 F.3d 1381, 1391–92 (6th Cir. 1996);

46

accord *Petteway v. Galveston County*, No. 23-40582, slip op.[4] at 21–23 (5th Cir. Aug. 1, 2024). Plaintiffs got the additional *majority-black districts* the district court ordered and they are not entitled to additional majority-*Democrat* districts.

## CONCLUSION

This Court should affirm the judgment below.


Respectfully submitted.

August 2, 2024.


<u>*/s/ Bryan P. Tyson*</u>
Bryan P. Tyson
Bryan F. Jacoutot
Diane F. LaRoss
  *Special Asst. Att'ys General*

Taylor English Duma LLP
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249
btyson@taylorenglish.com

<u>*/s/ Stephen J. Petrany*</u>
Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
Paul R. Draper
  *Deputy Solicitor General*

Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for the Secretary of State of Georgia*

---

[4] *Available at* https://www.ca5.uscourts.gov/opinions/pub/23/23-40582-CV3.pdf

47

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 8,658 words as counted by the word-processing system used to prepare the document.

/s/ *Bryan P. Tyson*
Bryan P. Tyson

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2024, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.

/s/ *Bryan P. Tyson*
Bryan P. Tyson