No. 24-10241

# In the United States Court of Appeals for the Eleventh Circuit

ANNIE LOIS GRANT et al.,
*Plaintiffs-Appellants*,

v.

SECRETARY OF STATE OF GEORGIA,
*Defendant-Appellee*.

On Appeal from the United States District Court
for the Northern District of Georgia
No. 1:22-cv-00122—Steve C. Jones, Judge

## REPLY BRIEF FOR APPELLANTS

Joyce Gist Lewis
Adam M. Sparks
**KREVOLIN & HORST, LLP**
One Atlantic Center
1201 W. Peachtree St. NW,
Suite 3250
Atlanta, GA 30309
Telephone: (404) 888-9700

Abha Khanna
Makeba Rutahindurwa
**ELIAS LAW GROUP LLP**
1700 Seventh Ave,
Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0177

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Plaintiffs-Appellants certify that Annie Lois Grant, Quentin T. Howell, Elroy Tolbert, Triana Arnold James, Eunice Sykes, Elbert Solomon, Dexter Wimbish, Garrett Reynolds, Jacqueline Faye Arbuthnot, Jacquelyn Bush, and Mary Nell Conner are individuals and that no publicly held corporation or company has an interest in the outcome of this case.

Plaintiffs-Appellants further certify that the following have an interest in the outcome of this case:

1. ACLU Foundation, Inc., *Counsel for Alpha Phi Alpha Plaintiffs*

2. ACLU Foundation of Georgia, Inc., *Counsel for Alphi Phi Alpha Plaintiffs*

3. Adegbile, Debo P., *Counsel for Alphi Phi Alpha Plaintiffs*

4. Aiken, D'Ericka, *Counsel for Alphi Phi Alpha Plaintiffs*

5. Allen, Erick, *Witness for Pendergrass Plaintiffs*

6. Arbuthnot, Jacqueline Faye, *Plaintiff*

7. Bokat-Lindell, Noah B., *Counsel for United States*

8. Boone, Robert, *Counsel for Alphi Phi Alpha Plaintiffs*

9. Boyle Jr., Donald P., *Counsel for Defendant*

10. Brown, Phil, *Alpha Phi Alpha Plaintiff*

11.    Brown, Theron, *Former Plaintiff*

12.    Bush, Jacquelyn, *Plaintiff*

13.    Calvo-Friedman, Jennesa, *Former Counsel for Alpha Phi Alpha Plaintiffs*

14.    Carr, Christopher, *Counsel for Defendant*

15.    Carter, Jason J., *Witness for Pendergrass Plaintiffs*

16.    Cheung, Ming, *Counsel for Alpha Phi Alpha Plaintiffs*

17.    Conner, Mary Nell, *Plaintiff*

18.    Data, Sonika, *Counsel for Alpha Phi Alpha Plaintiffs*

19.    DiGiuseppe, Marisa A., *Counsel for Alpha Phi Alpha Plaintiffs*

20.    Dixit, Anuj, *Counsel for Alpha Phi Alpha Plaintiffs*

21.    Douglas, Maura, *Counsel for Alpha Phi Alpha Plaintiffs*

22.    Draper, Paul Richard, *Former Counsel for Defendant*

23.    Duffey Jr., Hon. William S., *Former Defendant*

24.    Elias Law Group LLP, *Counsel for Plaintiffs*

25.    Flynn, Erin H., *Counsel for Intervenor*

26.    Ford, Christina A., *Counsel for Plaintiffs*

27.    Freeman, Daniel J., *Counsel for Intervenor*

28.    Garabadu, Rahul, *Former Counsel for Alpha Phi Alpha Plaintiffs*

29.    Geaghan-Breiner, Charlotte, *Counsel for Alpha Phi Alpha Plaintiffs*

30.    Georgia Department of Law, *Counsel for Defendant*

31.    Ghazal, Sara Tindall, *Former Defendant*

32.    Glaze, Ojuan, *Pendergrass Plaintiff*

33.    Glenn, Katie Bailey, *Alpha Phi Alpha Plaintiff*

34.    Grant, Annie Lois, *Plaintiff*

35.    Hamilton, Kevin J., *Former Counsel for Plaintiffs*

36.    Hawley, Jonathan P., *Former Counsel for Plaintiffs*

37.    Hennington, Elliott, *Pendergrass Plaintiff*

38.    Howell, Quentin T., *Plaintiff*

39.    Isaacson, Cory, *Counsel for Alpha Phi Alpha Plaintiffs*

40.    Ivey, Marvis McDaniel, *Amicus Curiae*

41.    Jacoutot, Bryan F., *Counsel for Defendant*

42.    James, Triana Arnold, *Plaintiff*

43.    Johnston, Janice W., *Former Defendant*

44.    Jones, Michael B., *Former Counsel for Plaintiffs*

45.    Jones, Hon. Steve C., *U.S. District Court Judge*

46.    Khanna, Abha, *Counsel for Plaintiffs*

47.    Kim, Eliot, *Counsel for Alpha Phi Alpha Plaintiffs*

48.    Kim, Taeyoung, *Counsel for Alpha Phi Alpha Plaintiffs*

49.    Krevolin & Horst LLC, *Counsel for Plaintiffs*

50.    Lakin, Sophia Lin, *Counsel for Alpha Phi Alpha Plaintiffs*

51.     LaRoss, Diane, *Counsel for Defendant*

52.     Le, Anh, *Former Defendant*

53.     Lewis, Joyce Gist, *Counsel for Plaintiffs*

54.     Lindsey, Edward, *Former Defendant*

55.     Mashburn, Matthew, *Former Defendant*

56.     May, Caitlin Felt, *Counsel for Alpha Phi Alpha Plaintiffs*

57.     McGowan, Charlene, *Former Counsel for Defendant*

58.     Miller, Alex W., *Counsel for Alpha Phi Alpha Plaintiffs*

59.     Miller, Kelsey A., *Former Counsel for Alpha Phi Alpha Plaintiffs*

60.     Mitchell, Cassie, *Counsel for Alpha Phi Alpha Plaintiffs*

61.     Osher, Daniel C., *Former Counsel for Plaintiffs*

62.     Paradise, Loree Anne, *Former Counsel for Defendant*

63.     Pendergrass, Coakley, *Pendergrass Plaintiff*

64.     Perkins Coie LLP, *Former Counsel for Plaintiffs*

65.     Petrany, Stephen J., *Counsel for Defendant*

66.     Raffensperger, Brad, *Defendant*

67.     Reynolds, Garrett, *Plaintiff*

68.     Richards, Robert, *Pendergrass Plaintiff*

69.     Rueckert, Jens, *Pendergrass Plaintiff*

70.     Ruiz Toro, Juan M., *Counsel for Alpha Phi Alpha Plaintiffs*

71.  Rutahindurwa, Makeba, *Counsel for Plaintiffs*

72.  Savitzky, Ari J., *Counsel for Alpha Phi Alpha Plaintiffs*

73.  Shaw, Abigail, *Former Counsel for Alpha Phi Alpha Plaintiffs*

74.  Sivaram, Anuradha, *Former Counsel for Alpha Phi Alpha Plaintiffs*

75.  Sixth District of the African Methodist Episcopal Church, *Alpha Phi Alpha Plaintiff*

76.  Solomon, Elbert, *Plaintiff*

77.  Sparks, Adam M., *Counsel for Plaintiffs*

78.  Smith, Casey Katharine, *Counsel for Alpha Phi Alpha Plaintiffs*

79.  Stewart, Janice, *Alpha Phi Alpha Plaintiff*

80.  Stewart, Michael Elliot, *Counsel for Intervenor*

81.  Strickland, Frank B., *Counsel for Defendant*

82.  Sykes, Eunice, *Plaintiff*

83.  Taylor English Duma LLP, *Counsel for Defendant*

84.  Tolbert, Elroy, *Plaintiff*

85.  Tsai, Denise, *Counsel for Alpha Phi Alpha Plaintiffs*

86.  Tyson, Bryan P., *Counsel for Defendant*

87.  United States, *Intervenor*

88.  Varghese, George P., *Counsel for Alpha Phi Alpha Plaintiffs*

89.  Vaughn, Elizabeth Marie Wilson, *Former Counsel for Defendant*

90.  Webb, Bryan K., *Counsel for Defendant*

91.   Weigel, Daniel H., *Counsel for Defendant*

92.   Weitzman, Samuel, *Former Counsel for Alpha Phi Alpha Plaintiffs*

93.   White, Graham W., *Former Counsel for Plaintiffs*

94.   Willard, Russell D., *Counsel for Defendant*

95.   Williams, Ayana, *Former Counsel for Alpha Phi Alpha Plaintiffs*

96.   Williams, Edward, *Former Counsel for Alpha Phi Alpha Plaintiffs*

97.   Wilmer Cutler Pickering Hale and Dorr LLP, *Counsel for Alpha Phi Alpha Plaintiffs*

98.   Wimbish, Dexter, *Plaintiff*

99.   Woods, Eric T., *Alpha Phi Alpha Plaintiff*

100.   Young, Sean Jengwei, *Former Counsel for Alpha Phi Alpha Plaintiffs*

101.   Zabel, Joseph D., *Former Counsel for Alpha Phi Alpha Plaintiffs*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

ARGUMENT .......................................................................................................... 1

    I.   The Secretary fails to justify the errors requiring reversal. ........................... 1

          A.     The court erred in approving maps that eliminated crossover districts that provided electoral opportunity for Black voters. ................................................ 2

          B.     The Secretary fails to justify the errors related to the new majority-Black districts requiring reversal. ................................................ 7

    II.  This case is about racial discrimination, not partisan discrimination. ............................. 12

CONCLUSION ..................................................................................................... 16

CERTIFICATE OF COMPLIANCE .................................................................... 17

CERTIFICATE OF SERVICE ............................................................................. 18

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Milligan*,
  599 U.S. 1 (2023)................................................................................15

*Bartlett v. Strickland*,
  556 U.S. 1 (2009)........................................................................3, 4, 6, 14

*Johnson v. De Grandy*,
  512 U.S. 997 (1994)......................................................................4, 5, 13

*League of United Latin Am. Citizens v. Perry*,
  548 U.S. 399 (2006)......................................................................12, 13

*Marbury v. Madison*,
  5 U.S. 137 (1803)...............................................................................10

*McGhee v. Granville County*,
  860 F.2d 110 (4th Cir. 1988) ............................................................10

*North Carolina v. Covington*,
  581 U.S. 486 (2017)..............................................................................4

*Shaw v. Hunt*,
  517 U.S. 899 (1996)......................................................................10, 11

*Singleton v. Allen*,
  690 F. Supp. 3d 1226 (N.D. Ala. 2023), *appeal dismissed sub nom.
  Milligan v. Co-Chairs of Ala. Permanent Legis. Comm. on
  Reapportionment*, No. 23-12922-D, 2023 WL 6568350 (11th Cir.
  Oct. 3, 2023) ......................................................................................15

*Thornburg v. Gingles*,
  478 U.S. 30 (1986)................................................................................5

*United States v. Dallas Cnty. Comm'n*,
  850 F.2d 1433 (11th Cir. 1988) ..................................................2, 6, 11

**INTRODUCTION**

After Georgia's previous legislative districting maps were struck down for depriving Black voters of electoral opportunities guaranteed to them by Section 2 of the Voting Rights Act, the General Assembly enacted new maps that failed to provide the required additional electoral opportunities to Black voters. Because new maps SB 1EX and HB 1EX fail to completely remedy the Section 2 violations, the district court's approval of those maps was reversible error.

The question on appeal is narrow: what does "additional" opportunity mean in the context of a Section 2 remedy? The General Assembly's decision to create Black-opportunity districts drawn only partially from the proven vote dilution areas, as well as its elimination of crossover districts that provided Black voters the opportunity to elect their preferred candidates, guarantees the ongoing dilution of Black voting strength and therefore fails to completely remedy the Section 2 violations.

**ARGUMENT**

**I.     The Secretary fails to justify the errors requiring reversal.**

SB 1EX and HB 1EX added the required new majority-Black districts by populating those districts with significant numbers of Black voters from outside of the vote dilution area. Br. for Appellants 8–13, ECF No. 32 ("Opening Br."). The maps also eliminate five preexisting crossover districts in which Black voters could

1

elect their preferred candidates of choice. *Id.* 13–16. These actions, independently and collectively, placed a cap on Black opportunity in Georgia's legislative districts and failed to "with certitude *completely* remedy the Section 2 violation[s]." *United States v. Dallas Cnty. Comm'n*, 850 F.2d 1433, 1438 (11th Cir. 1988) (quoting *Dillard v. Crenshaw Cnty.*, 831 F.2d 246, 252 (11th Cir. 1987)).

The Secretary does not dispute the facts. Instead, he argues that Section 2 effectively provides legislatures with the choice of whether to create additional opportunity districts when the statute has been violated. He is wrong.

### A. The court erred in approving maps that eliminated crossover districts that provided electoral opportunity for Black voters.

The General Assembly was required, by court order and Section 2, to "remedy the Section 2 violations by incorporating *additional* legislative districts in which Black voters have a demonstrable opportunity to elect their candidates of choice." Doc. 294 at 510 (emphasis added); *see* Doc. 317 at 13 (identifying cases where courts specified the need for *additional* minority-opportunity districts to remedy Section 2 violations). Instead, the General Assembly *shifted* Black-opportunity from existing crossover districts to the new majority-Black districts.

The Secretary argues that the General Assembly was free to cannibalize existing crossover districts in drawing a remedial plan because the possibility of creating crossover districts cannot give rise to Section 2 liability, Br. of Ga. Sec'y of State 43–44, ECF No. 39 ("Resp. Br."), but this argument improperly conflates

2

liability with remedy in an attempt to send this case back to square one. Section 2 liability has already been established with respect to the 2021 legislative plans, which already included two crossover districts in the Senate map (Districts 6 and 42) and three crossover districts in the House map (Districts 40, 81, and 82). The question here is what comes next: Where plaintiffs have established that the State is diluting Black voting strength in violation of federal law, may the State refuse to create additional districts where Black voters can elect candidates of choice? It may not, and the Secretary has not identified any case suggesting otherwise.

The Secretary relies on *Bartlett v. Strickland*, 556 U.S. 1 (2009) (plurality op.), which analyzed the prerequisites for establishing Section 2 *liability*—an inquiry that has already been resolved in Plaintiffs' favor here. The *Bartlett* plurality "recognize[d] only that there is no support for the claim that § 2 can require *the creation of crossover districts in the first instance*." 556 U.S. at 24 (emphasis added). But the fact that new crossover districts are not "require[d] . . . in the first instance" under Section 2, *id.*, does not mean that such districts do not inform whether a remedial plan affords an equal opportunity in the next instance. Indeed, the Supreme Court recognized that crossover districts "can be evidence . . . of equal political opportunity under the § 2 totality-of-the-circumstances analysis." *Id.* Since, at the remedial phase, the court is tasked with determining whether a map remedies the minority vote dilution to finally ensure "equal political opportunity," *id.*, it must take

3

into consideration the addition or elimination of crossover districts on overall Black electoral opportunity. *See also id.* at 25 ("[Section] 2 must be interpreted to ensure that continued progress."). This is especially true given the court's requirement to "undertake an equitable weighing process to select a fitting remedy" for the Section 2 violation. *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (cleaned up).

The weight of Supreme Court precedent confirms that crossover districts must be considered as part of the equation at the remedial stage; otherwise states would be allowed to maximize white voting power by offsetting minority gains required following a finding of a Section 2 violation with minority losses in other parts of the map—"in derogation of the statutory text, . . . its considered purpose, . . . and of the ideal that the Voting Rights Act of 1965 attempts to foster." *Johnson v. De Grandy*, 512 U.S. 997, 1018 (1994). The Supreme Court has recognized that "the textual command of § 2, that the presence or absence of a violation be assessed 'based on the totality of circumstances,' . . . springs from the demonstrated ingenuity of state and local governments in hobbling minority voting power." *Id.* (quoting Section 2). The Court has therefore remained "chary of entertaining a simplification of the sort the State now urges here," and instead determined that "whether the political processes are equally open depends upon a *searching practical evaluation* of the past and present reality." *Id.* at 1018–19 (emphasis added) (quoting S.Rep. No. 97–417, p. 30 (1982) 1982 U.S. Code Cong. & Admin. News).

4

Here, there is little doubt that the State's narrow interpretation of its responsibility to remedy the Section 2 violations has the practical effect of minimizing Black voting strength statewide. The State's attempt to "trade[] off" "the rights of some minority voters under § 2" "against the rights of other members of the same minority class" remains "highly suspect" in any instance, *id.* at 1019, and all the more so in the context of a purported remedy to the State's Section 2 violation. *See* Doc. 294 at 516 (acknowledging that "Georgia has not reached the point where the political process has equal openness and equal opportunity for everyone" and its order "ensure[s] that Georgia continues to move toward equal openness and equal opportunity for everyone to participate in the electoral system").

In fact, the State's elimination of crossover districts is a step backwards for both Black Georgians and Section 2.

> If the lesson of *Gingles* is that society's racial and ethnic cleavages sometimes necessitate majority-minority districts to ensure equal political and electoral opportunity, that should not obscure the fact that there are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice. Those candidates may not represent perfection to every minority voter, but minority voters are not immune from the obligation to pull, haul, and trade to find common political ground, the virtue of which is not to be slighted in applying a statute meant to hasten the waning of racism in American politics.

*De Grandy*, 512 U.S. at 1020 (discussing *Thornburg v. Gingles*, 478 U.S. 30 (1986)).

Here, the State of Georgia's grudging creation of majority-Black districts where they

were "necessitate[d]" under Section 2 came at the expense of those Black voters who had successfully "pull[ed], haul[ed], and trade[d] to find common political ground" with voters from other racial groups, in violation of both the text and the principles of Section 2 and the continued progress of Black Georgians across the state. *Id.*

Contrary to the Secretary's position, there is nothing "arbitrary or impossible" about recognizing the opportunity provided by crossover districts. Resp. Br. 44. States have long been able to avoid Section 2 liability by providing minority voters with electoral opportunity through crossover districts. *Bartlett*, 556 U.S. at 13. And unlike *Bartlett*, this case is not about the strict standard a plaintiff must satisfy to establish Section 2 liability; it is about the functional approach to determining whether an established vote dilution injury has been fully and completely remedied.[1]

In sum, the new legislative maps fail to completely remedy the Section 2 violations because they swap out opportunity for Black voters in crossover districts for opportunity for Black voters in the new majority-Black districts, defying both the court's order, Doc. 286 at 509–10, and the requirements of Section 2. Section 2 remedies must "*fully* provide[] equal opportunity for minority citizens to participate and to elect candidates of their choice." *Dall. Cnty. Comm'n*, 850 F.2d at 1442

---

[1] The Secretary also argues it would be hypocritical for the court to consider crossover districts at the remedial phase when it declined to consider crossover districts as majority-Black districts in the proportionality analysis. Resp. Br. 44–45. The Secretary again improperly conflates the distinct doctrinal tests for determining liability and evaluating the remedy.

(cleaned up). It is not enough to simply shuffle around Black voting opportunities in service of maximizing white voting strength—such an approach falls short of a "full[]" remedy and does nothing to "equal[ize]" opportunity, as Section 2 requires. *Id.* This Court should reject the State's cynical attempt to weaponize its "opportunity to adopt a remedial . . . Senate plan, and House plan" after drawing maps in violation of Section 2, Doc. 286 at 510, to thwart the voting strength of Black Georgians statewide.[2]

### B. The Secretary fails to justify the errors related to the new majority-Black districts requiring reversal.

The district court independently abused its discretion when it failed to analyze whether drawing new majority-Black districts with Black voters from outside the vote dilution areas fully and adequately remedied the Section 2 injuries within the vote dilution areas.

The Secretary does not dispute that nearly a quarter of HD 145's BVAP, nearly half of SD 28's BVAP, and *more than half* of HDs 64 and 117's BVAP include Black Georgians who live *outside* of the vote dilution areas identified by the district court. Opening Br. 8–9 (citing Doc. 317-1 at ¶¶ 13, 34, 36–37). Instead, the Secretary asks the Court to engage with the maps superficially: the General

---

[2] The Secretary's argument that Plaintiffs should have appealed the district court's liability order because "the district court *did not* order the relief Plaintiffs now argue for," Resp. Br. at 38–39, is a nonstarter. Plaintiffs are not seeking an alteration of the judgment on liability, but reversal of the court's approval of the remedy.

Assembly drew the new majority-Black districts in the general regions of the proven vote dilution injuries, so the inquiry ends there. Resp. Br. 20–21. He argues Plaintiffs merely prefer different maps. *Id.* Not so.

Contrary to the Secretary's strawman, Section 2 does not require states to use unlawful district lines as a "template" for a remedial map. *Id.* at 32. Obviously, the remedial districts are not going to trace the exact boundary of any prior district. It is going to reconfigure district boundaries to unpack and uncrack Black *populations* that were previously diluted. The previous boundaries simply identify the injured voters in need of a remedy, and so the remedial map-drawer looking to add opportunity districts should have started with these populations.

The Secretary argues that Plaintiffs' own illustrative maps included illustrative majority-Black districts that extended beyond the boundaries identified by the court. *Id.* at 32. He misses the crux of Plaintiffs argument; it is not that the remedial districts had to be confined entirely within the vote dilution areas, but that meaningful, practical Section 2 relief for the Black voters suffering a vote dilution injury necessarily requires focusing on the cohesive Black populations that proved their vote dilution injury, as reflected in the illustrative districts. A simple comparison of illustrative SD 28 (left) and the remedial SD 28 (right) shows how the General Assembly bypassed swaths of voters within the vote dilution area, instead reaching north into already existing majority-Black districts:



Doc. 294 at 324; Doc. 317-1 at 5 (Figure 2).

For example, Coweta County—a county within the vote dilution area as part of old SD 28— is included in illustrative SD 28 but excluded entirely from remedial SD 28. The Secretary's expert admits that remedial SD 28 shares *only* 1.1% of the Black voting age population of illustrative SD 28. Doc. 326-2 at 21 (tbl.7). Instead, the General Assembly anchored majority-Black SD 28 further north near already existing majority-Black districts and took populations from those districts to ensure that there were no meaningful additional gains for Black voters.[3]

---

[3] While the *Alpha Phi Alpha* Plaintiffs' illustrative SD 28 did not include Coweta County, it was anchored directly in the south metro Atlanta region and did not extend north, again ensuring that the Black voters of the vote dilution area were given relief. *See* Doc. 294 at 291 (map of illustrative district comprised of Spalding, Fayette, and south Clayton Counites).

While Section 2 does not entitle every Black voter residing within the vote dilution area to be placed into the new Black-opportunity district, Opening Br. 12, there is no dispute that the right to a Section 2 remedy belongs to the Black voters who suffered a vote dilution injury. *Marbury v. Madison*, 5 U.S. 137, 163 (1803) ("[I]t is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded." (quotation omitted)); *Shaw v. Hunt*, 517 U.S. 899, 917 (1996) ("To accept that the district may be placed anywhere implies that the claim, and hence the coordinate right to an undiluted vote (to cast a ballot equal among voters), belongs to the minority as a group and not to its individual members. It does not."). Accordingly, a "'complete' and legally adequate remedy" for the State's Section 2 violation should aim to "eradicate[] to the maximum extent possible" as "constrained by the size, compactness, and cohesion elements of the dilution concept." *McGhee v. Granville County*, 860 F.2d 110, 118 (4th Cir. 1988).[4] The State may not choose as a matter of

---

[4] The Secretary mischaracterizes the court's holding in *McGhee* when he asserts that it "reversed a district court for rejecting the county's redistricting scheme because, although it created the maximum possible number of majority-black districts, it left many black voters outside of those districts." Resp. Br. 37. The court actually found that the district court erred when it rejected a remedial legislative districting plan "for the sole reason that the representation possible does not sufficiently approximate proportionality." *McGhee*, 860 F.2d at 120; *see also id.* at 114 (noting that the court "rejected the county's plan on this reasoning" that "it gave black voters, some 41% of the voting population, little likelihood of electing more than two commissioners (28% of the board)").

legislative policy to simply bypass the Black voters who suffered the Section 2 injury by drawing in Black voters from other areas, many of whom already had the opportunity to elect their preferred candidates.

The Secretary faults Plaintiffs for relying on *Shaw*, insinuating that racial gerrymandering cases are irrelevant to analyzing remedial maps. Resp. Br. 33. But *Shaw did* involve an analysis of what kind of remedy is appropriate for a Section 2 violation. *See Shaw*, 517 U.S. at 916–18. And unlike the Secretary's representation otherwise, this case is *not* "the polar opposite of *Shaw.*" Resp. Br. 34. Just as in *Shaw*, the Section 2 violations that Plaintiffs proved—based on the cracking and packing of Black voters within the boundaries identified by the court, Doc. 294 at 512–13—"flows from the fact that individuals in this area 'have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *Shaw*, 517 U.S. at 917 (quoting Section 2). The Secretary asks the Court to tolerate any remedy that does not, with certitude, completely *fail* to address the vote dilution injury that was shown. Resp. Br. 35 (conceding "Georgia could not create a non-compact majority-black district in Augusta to justify 'dismantling' a compact majority-black district in Atlanta"). But that turns the test on its head. Once liability is established, states are required to "with certitude *completely remedy* the Section 2 violation." *Dall. Cnty. Comm'n*, 850 F.2d at 1438 (second emphasis added) (quoting *Dillard*, 831 F.2d at 252). A

11

"remedy" that falls moderately short of that standard is just as unacceptable as one that fails egregiously.

The Secretary's attempts to distinguish *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) ("*LULAC*"), fare no better. Resp. Br. 35–36. The Secretary focuses on the fact that the improper remedy in *LULAC* was the result of the creation of a non-compact majority-minority district in another part of the state. *LULAC*, 548 U.S. at 437. But there is no meaningful difference between a lack of a Section 2 right stemming from the fact that the minority population is not sufficiently compact or because the minority population is not in the vote dilution area. The result is the same: The State cannot purport to remedy a Section 2 violation by creating new majority-Black districts that includes minority populations "without a § 2 right" and be excused "for its failure to prove an opportunity district for those with a § 2 right." *Id.* at 430.

## II. This case is about racial discrimination, not partisan discrimination.

The Secretary seeks to deny Black voters the remedy that Section 2 guarantees them by complaining that the remedy would benefit candidates that Black voters prefer. *See, e.g.*, Resp. Br. 2 (bemoaning that the preservation of districts where Black voters can elect candidates of choice would be "beneficial to Democrats"). It does not matter whether Black voters tend to support Republican candidates or Democratic candidates—each of which has been the case in American history. What

matters is that where Black voters are large enough to comprise a majority in a single-member district, vote cohesively, are stymied by bloc voting, and the totality of circumstances supports relief—each of which has been established here—they are entitled to an additional district where they can elect their preferred candidates. Plaintiffs satisfied this standard twice with respect to the Senate map and five times with respect to the House map. Contrary to the Secretary's misdirection, the simple tautology that the *party* Black voters prefer will benefit if *candidates* that Black voters prefer are able to win election does not make this case about partisanship.

The Secretary fundamentally misconceives Section 2's purpose and application. The problem that Section 2 redresses in the vote dilution context is not that white voters vote differently than Black voters, or even that white-preferred Republican candidates defeat Black-preferred Democratic candidates. The problem is that a Black-preferred candidate *could win* in a given area *but for* the chosen placement of district lines, resulting in vote dilution. See *LULAC*, 548 U.S. at 433. As long as officials elected by white majorities can rely on dilutive redistricting schemes as a substitute for courting Black support to win office, the interests of Black voters are condemned to echo in the void. A Section 2 remedy gives candidates the electoral incentive to champion Black voters' unique interests and be their candidate of choice because Black voters have a meaningful opportunity to "pull, haul, and trade" their way to political power. *De Grandy*, 512 U.S. at 1020.

13

Under lawful maps, Democrats and Republicans should have equal incentive to add to their coalition by winning Black voters to their tent.

The Secretary's approach, in contrast, manipulates and distorts the electoral playing field by guaranteeing that white-preferred candidates can remain in power, without ever having to solicit a Black vote, by drawing lines that exploit racially polarized voting. And when a violation is actually proven, as it has been here, the Secretary would *still* guarantee white-preferred candidates remain in power by eliminating effective opportunity districts for Black voters, ensuring Black voters remain inconsequential and underrepresented in the State. This undermines the purpose of Section 2, which was passed to "foster this cooperation" between differing racial groups to join together and elect their candidates of choice. *See Bartlett*, 556 U.S. at 25.

* * *

The Secretary would ask the Court to overlook the General Assembly's deliberate maneuver—after already having violated the voting rights of Black Georgians—to minimize Black voting strength in the State by failing to provide a remedy to tens of thousands of Black voters in the vote dilution areas and dismantling five districts that previously provided Black voters an opportunity to elect their candidates of choice. But the Court cannot accept the Secretary's narrow view of the issues. "The requirement of a complete remedy means that we cannot

14

accept a remedial plan that (1) perpetuates the vote dilution we found, or (2) only partially remedies it." *Singleton v. Allen*, 690 F. Supp. 3d 1226, 1294 (N.D. Ala. 2023) (cleaned up), *appeal dismissed sub nom. Milligan v. Co-Chairs of Ala. Permanent Legis. Comm. on Reapportionment*, No. 23-12922-D, 2023 WL 6568350 (11th Cir. Oct. 3, 2023) (looking at the plan as a whole to determine whether it provided an additional district that gave Black voters the opportunity to elect their preferred candidates). Here, SB 1EX and HB 1EX fail for two independent reasons: (1) The General Assembly dismantled five Black-opportunity districts and (2) created new majority-Black districts by drawing significantly outside the vote dilution areas to include Black voters, many of whom already had an opportunity to elect their preferred candidates, at the expense of remedying the injury for tens of thousands of Black voters within the vote dilution areas.

In the end, the Secretary argues that the State can prioritize political advantages over compliance with the Voting Rights Act. The new maps effectively ensure that Black voters in Georgia will never have equal opportunity to elect state representatives that serve their needs and interests, despite the dramatic increase in the Black population who vote cohesively for candidates that white voters do not support and the proven "social and historical conditions" that have resulted in "inequality in the opportunities enjoyed by [B]lack and white voters." *Milligan*, 599 U.S. at 17. The Court must not allow such flagrant disrespect and disregard for Black

Georgians who fought hard and won the right to equal opportunity for additional representation in the State.

## CONCLUSION

For the foregoing reasons, the district court's remedial order should be vacated and the matter remanded for further proceedings.

Dated: September 23, 2024       Respectfully submitted,

|  |  |
|---|---|
|  | By *Abha Khanna* |
| Joyce Gist Lewis | Abha Khanna |
| Georgia Bar No. 296261 | Makeba Rutahindurwa |
| Adam M. Sparks | ELIAS LAW GROUP LLP |
| Georgia Bar No. 341578 | 1700 Seventh Ave., |
| KREVOLIN & HORST, LLC | Suite 2100 |
| One Atlantic Center | Seattle, WA 98101 |
| 1201 W. Peachtree St. NW, | (206) 656-0177 |
| Suite 3250 | AKhanna@elias.law |
| Atlanta, GA 30309 | MRutahindurwa@elias.law |
| (404) 888-9700 |  |
| JLewis@khlawfirm.com |  |
| Sparks@khlawfirm.com |  |

*Counsel for Plaintiffs-Appellants*

16

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(ii), as it contains 3,819 words, excluding those parts exempted by 11th Cir. Local R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as the brief has been prepared in a proportionally spaced typeface using Microsoft Word Times New Roman 14-point font.

Dated: September 23, 2024              *Adam M. Sparks*_____
                                       *Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that, on September 23, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Dated: September 23, 2024

*Adam M. Sparks*
*Counsel for Plaintiffs-Appellants*

18